# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br>　　　　　　　　　　**Plaintiff,**<br>　　**v.**<br>**GEORGE STUBOS,**<br>　　　　　　　　**Defendant,**<br>**and**<br>**DORI-ANN STUBOS,**<br>　　　　　　**Relief Defendant.** | **Civil Action No. 22-CV-____ (___)**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff, Securities and Exchange Commission (the "Commission"), alleges the following against Defendant George Stubos ("Stubos") and Relief Defendant Dori-Ann Stubos:

## SUMMARY

1.　　This is a securities fraud enforcement action.  From at least March 2012 through at least April 2015 (the "Relevant Period"), Stubos engaged in a sophisticated scheme that defrauded numerous retail investors by concealing the fact that he, in concert with others, controlled the stock of several small and thinly-traded U.S. companies including, Petrosonic Energy Inc. ("Petrosonic") and Ener-Core, Inc. ("Ener-Core" and collectively, the "Issuers" (a term commonly applied to companies that issue stock)).

2.　　Instead of holding shares in his own name, Stubos used foreign nominee companies to hide his control of the Issuers and their stock.  He then directed sales of the Issuers' shares into the market.  Stubos' sales of stock violated the U.S. securities laws because he did not register his sales of those shares with the Commission and did not disclose accurate information

about his control over the Issuers.  As a result of Stubos' deceptive conduct, investors buying the shares he sold were deprived of important information – that the stock they purchased was being dumped by the person controlling that company.  Stubos' fraudulent scheme generated approximately $11 million in illicit proceeds.

3.     As part of his scheme, Stubos also frequently sought to increase demand for the Issuers' stock by funding various promotions touting the stock.  The promotions that Stubos sponsored were misleading because they did not disclose that the Issuers' largest stockholder was paying to encourage potential investors to buy the stock while he would be selling the stock.  Stubos' promotions were successful.  As the price and trading volume of the Issuers' stock increased during each promotion, Stubos began selling his shares into the market.

4.     Stubos also engaged in manipulative trading that enabled him to sell more of the Issuers' stock.  For at least one of the Issuers, Ener-Core, Stubos directed purchases and sales of its stock between different foreign brokerage accounts controlled by his associates.  His purpose in making these trades was to make investors think there was active market trading in Ener-Core stock and thus increase investors' demand for the stock.

**Stubos Violated the Securities Laws**

5.     As a result of the conduct alleged herein, Stubos violated Sections 17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act"), Section 9(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") and Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder.

6.     The Commission seeks a permanent injunction against Stubos, enjoining him from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint; disgorgement of all ill-gotten gains from the unlawful conduct set forth in this

Complaint, together with prejudgment interest pursuant to Section 21(d) of the Exchange Act; an order barring Stubos from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act and/or Section 21(d) of the Exchange Act; and a conduct-based injunction enjoining Stubos from directly or indirectly, including but not limited to, through an entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent Stubos from purchasing or selling securities listed on a national securities exchange for his own personal account; and such other relief as the Court may deem appropriate.

7.      The Commission also seeks relief against Dori-Ann Stubos (the "Relief Defendant") who received proceeds of the Defendant's unlawful acts, practices and schemes and should not be entitled to retain those illegally-derived proceeds.

8.      The Commission seeks a temporary restraining order and a preliminary injunction to freeze assets held by the Defendant and the Relief Defendant and to preserve those assets necessary to satisfy an eventual judgment against the Defendant.  The Commission will also seek a repatriation order to facilitate the prompt resolution of this matter on the merits.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. §77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§78u(d), 78u(e), 78aa].

10.     Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. §77v(a)] and Section 27 of the Exchange Act [15 U.S.C. §78aa].  Certain of the acts, practices, transactions and courses of business alleged in this Complaint occurred within the Southern District of New York, and were effected, directly or indirectly, by making use of means or

instrumentalities of transportation or communication in interstate commerce, or the mails.  For example, during the Relevant Period, certain individuals who reside in the Southern District of New York purchased the stock of Petrosonic and Ener-Core.

## DEFENDANT

11.    George Stubos, age 55, is a Canadian citizen and a resident of Vancouver, Canada.  On June 28, 2007, the British Columbia Securities Commission ("BCSC") barred Stubos from participation in the securities industry and from acting as a director or officer of any issuer for a period of two years, because he traded in the stock of an issuer where he was a director and insider and failed to file insider reports required under Canadian law.  The BCSC also barred Stubos, an investment adviser at the time, from participating in any investor relations activities for two years.  On September 3, 1998, the Vancouver Stock Exchange ("Exchange") barred Stubos from the Exchange for one year followed by one year of supervision upon return to the industry and ordered him to pay fines and disgorgement for executing trades in a client account without the client's permission.

## RELIEF DEFENDANT

12.    Dori-Ann Stubos, age 55, is a Canadian citizen, a resident of Vancouver, Canada and the wife of George Stubos.  George Stubos transferred, directly or indirectly, at least $1.3 million derived from his illicit stock sales for the purchase of a house in Palm Springs, California in the name of Dori-Ann Stubos.

## RELATED INDIVIDUALS AND ENTITIES

13.    Morrie N. Tobin, age 57, is a Canadian citizen and was a resident of Los Angeles, California.  On February 27, 2019, Tobin pled guilty to charges of conspiracy to commit securities fraud and aiding and abetting securities fraud.  *See U.S. v. Tobin*, 18-CR-10444 (D.

Mass.).  The Commission filed an action against Tobin on November 27, 2018, and on April 16,

2021, the District Court entered final judgment against Tobin enjoining him from future

violations of the registration provisions of the Securities Act and the antifraud provisions of the

Securities Act and the Exchange Act and imposing a penny stock bar.  *See SEC v. Tobin et al.*,

No. 18-CV-12451 (D. Mass.).

14.     Petrosonic Energy Inc. ("Petrosonic") was a Nevada corporation with its principal

place of business in Los Angeles, California, and during the Relevant Period, it was purportedly

in the business of petroleum refining.  During the Relevant Period, Petrosonic's common stock

was registered with the Commission under Section 12(g) of the Exchange Act.  The Commission

suspended trading in the securities of Petrosonic on September 20, 2018 because Petrosonic had

failed to file required periodic reports with the Commission since September 30, 2016.  On

August 22, 2019, the Commission revoked the registration of its shares.  During the Relevant

Period, Petrosonic's securities were quoted on OTC Link, operated by OTC Markets Group, Inc.,

under the symbol "PSON," and Petrosonic filed periodic reports with the Commission pursuant

to Section 13(a) of the Exchange Act and the rules thereunder.

15.     Ener-Core, Inc., ("Ener-Core") is a Delaware corporation with its principal place

of business in Laguna Niguel, California, and during the Relevant Period, it purportedly designed

and manufactured systems producing continuous energy.  Ener-Core's common stock was

registered with the Commission under Section 12(g) of the Exchange Act in 2015.  During the

Relevant Period, Ener-Core's securities were quoted on OTC Link under the symbol "ENCR."

## BACKGROUND AND DEFINITIONS

16.     Before selling stock, persons who control the stock of public companies ("control

persons") are required to: (a) register such sales with the Commission pursuant to Section 5 of

the Securities Act [15 U.S.C. §77e]; (b) sell the stock pursuant to an applicable exemption from

registration; or (c) sell the stock pursuant to conditions set forth in SEC Rule 144 [17 C.F.R.

§240.144], including limitations on the amount of stock a control person can legally sell.  In

addition, for public companies whose securities are registered under Section 12 of the Exchange

Act, investors owning 5% or more of such company's stock are required publicly to disclose

their ownership interest, while investors owning 10% or more of such company's stock are

required publicly to disclose all of their trading in that stock, regardless of quantity.  Such

registration requirements, sale restrictions, and disclosure obligations are safeguards designed to

protect the market for purchases and sales of stock, to inform investors about the nature of the

stock they are holding or considering buying, and from whom they would be buying that stock.

17.     An "affiliate" of an issuer is a person or entity that, directly or indirectly through

one or more intermediaries, controls, is controlled by, or is under common control with, such

issuer (i.e., a control person).  "Control" means the power to direct management and policies of

the company in question.  Typically, affiliates include officers, directors and controlling

shareholders but any person who is under "common control" with or has common control of an

issuer is also an affiliate.

18.     The Over-the-Counter ("OTC") Markets is a stock quotation service based in

New York that facilitates public trading of shares in public companies that are not otherwise

listed on national securities exchanges (like NASDAQ or the New York Stock Exchange).

Public companies that do not have an obligation to file reports with the Commission may,

nonetheless, choose to file public reports (such as quarterly and annual statements) on the OTC

Markets website for investors to review and consider when making investment decisions.

19.     "Penny Stock," as used herein, generally refers to a security issued by a very

small company that trades at less than $5 per share.  During the Relevant Period, both Petrosonic and Ener-Core were penny stocks.

20.     "Restricted stock" includes stock of a publicly traded company (also known as an "issuer") that has been acquired from an issuer, or an affiliate of an issuer, in a private transaction that is not registered with the Commission.  In addition, stock held by an issuer or affiliate of an issuer is restricted stock.  Absent an exemption under the federal securities laws and rules, restricted stock cannot legally be offered or sold to the public unless a securities registration statement has been filed with the Commission (for an offer) or is in effect (for a sale).  A registration statement contains important information about an issuer's business operations, financial condition, results of operation, risk factors, and management.  It also identifies any person or group who is the beneficial owner of more than 5% of the company's securities.

21.     "Unrestricted stock" is stock that may legally be offered and sold in the public securities marketplace by a non-affiliate, ordinarily having previously been subject to a registration statement.  Registration statements are transaction specific, and apply to each separate offer and sale as detailed in the registration statement.  Registration, therefore, does not attach to the security itself, and registration at one stage for one party does not necessarily suffice to register subsequent offers and sales by the same or different parties.  When a control person buys publicly traded or otherwise unrestricted shares in a company that s/he controls, those shares automatically become subject to the legal restrictions on sales by an affiliate. Such legal restrictions include strict limits on the quantity of shares that may be sold in the public markets absent registration. Without registration, affiliates are prohibited from selling large quantities of an issuer's shares, regardless of how the affiliates obtained those shares.

22.     "Float" is the amount of unrestricted shares on deposit with broker-dealers and available for trading in the public market.

23.     A "transfer agent" is a company which, among other things, issues and cancels certificates of a company's stock to reflect changes in ownership.  Many companies that have publicly traded securities use transfer agents to keep track of the individuals and entities that own their stock.  Transfer agents routinely keep track of whether shares are restricted from resale.

**The Sharp Group**

24.     Stubos utilized the illicit services of Frederick L. Sharp and his employees ("the Sharp Group") to facilitate each step of his fraud.  The Sharp Group's operators were sued by the Commission for violating the securities laws.  *See SEC v. Sharp, et. al.*, No. 1:21-cv-11276-WGY (D. Mass. filed Aug. 5, 2021).  Sharp and one of his employees, Courtney Kelln, were also charged criminally by the United States Department of Justice.  *See U.S. v. Sharp, et. al.*, 1:21-mj-07182-JCB (D. Mass filed Aug. 4, 2021).

25.     From at least 2010 and continuing after the Relevant Period, the Sharp Group was in the business of facilitating illegal stock sales in the public securities markets.  The Sharp Group provided a variety of services to help its clients (including Stubos), who were public company control persons, conceal their identities when selling the stock of companies they controlled.  By utilizing the Sharp Group's services to disguise his identity and his controlling positions, Stubos fraudulently concealed the fact that he, a public company control person, was selling large blocks of stock to unsuspecting investors.

26.     The Sharp Group deliberately concealed the identities of its clients through the array of services it offered, including: forming and providing offshore nominee companies that held shares for undisclosed control persons; arranging for clients to deposit stock in offshore

trading platforms to obfuscate the control persons' association with their public company penny stock; and providing and administering an encrypted communication network by purchasing, configuring and delivering devices which the Sharp Group referred to as "xPhones."  The xPhones could only be used for communications on the Sharp Group's encrypted communications network, and xPhone users communicated using code-names and numbers.  As detailed below, Stubos utilized all the foregoing Sharp Group services in carrying out his fraudulent scheme.

27.     The Sharp Group also provided additional services to its clients to further the clients' fraudulent schemes such as: administering a proprietary accounting system, referred to as "Q," that tracked a client's total stock holdings and sales across various nominee shareholders and trading platforms; paying out the proceeds of illegal stock sales at clients' direction to accounts around the world and/or to clients' internal accounts with the Sharp Group; arranging to route such payments by circuitous methods designed to conceal the source of funds; and fabricating documents, such as invoices, to conceal the nature and source of the payments. Stubos also utilized these additional Sharp Group services in carrying out his fraudulent scheme. Stubos' codenames on xPhone messages and in the Q accounting system were "Lion" and "77."

## DEFENDANT'S PETROSONIC FRAUD

28.     Stubos became a Sharp client in 2012.  Shortly after becoming a client, Stubos began transferring his controlling position in Petrosonic to the Sharp Group.  In late March and early April 2012, the Sharp Group received two deposits of purportedly unrestricted shares of Petrosonic, totaling approximately 2.6 million shares, into Stubos' Q account.  One month later, Petrosonic underwent an 11.25-for-1 forward stock split resulting in Stubos holding 29.6 million purportedly unrestricted shares of Petrosonic with the Sharp Group.  Later that year, Stubos

transferred an additional 14.6 million restricted shares of Petrosonic to the Sharp Group.  As of

December 31, 2012, Petrosonic had 70.3 million shares outstanding, and Stubos, through the

Sharp Group, held 56% of its outstanding shares.  Therefore, Stubos was an affiliate of

Petrosonic.

29.     The Sharp Group supplied various nominee companies to hold Stubos' penny

stock.  Stubos caused the Sharp Group to strategically split the stock into blocks of stock of less

than 5% of the total outstanding stock to be held in the name of each nominee company.  As

discussed above, breaking the shares into blocks of less than 5% ownership was done to avoid

reporting requirements and restrictions and scrutiny by brokerage firms and other market

participants like transfer agents.

30.     In February 2013, Stubos demonstrated his knowledge of the 5% ownership

reporting requirement in an encrypted xPhone message exchange with Sharp.  In that exchange,

Sharp suggested moving 6.6 million purportedly free-trading shares but wanted to make sure that

the stock is held in two positions, so that each position would be under 5% of the total

outstanding stock, to avoid scrutiny from brokers and others.  Stubos responded, "Ok, sounds

like a plan…the restricted [shares] should be registered in 4 new shareholders, with 2 of them

having 3.5 [million shares]…"  When Sharp questioned Stubos stating that 3.5 million shares is

more than 5%, Stubos corrected him and explained that 3.5 million shares are less than 5%,

because "…having closed 12 million shares at .25 we now have 65m + 12m outstanding so 77

million shares out[standing]."

31.     Beginning in April 2012, the Sharp Group began depositing Stubos' Petrosonic

shares into various Sharp Group-administered nominee companies' overseas brokerage accounts.

By December 31, 2012, Stubos, using the Sharp Group's services, accounted for approximately

98% of all Petrosonic stock deposits which had been made with any brokers in the world (the "float").  These purportedly unrestricted shares held by the Sharp Group's nominee companies should have been restricted because Stubos retained control and ownership of those shares.

### Misleading Stock Promotion

32.     From 2012 through 2014, Stubos secretly funded multiple stock promotions of Petrosonic to create interest in the stock among investors, increase demand for the stock, and thus, drive up Petrosonic's stock price and trading volume.  Stubos hid his involvement in funding stock promotions in various ways.  First, as evidenced by Q accounting records, Stubos used the Sharp Group to make payments to various stock promoters, thus concealing his role in funding the promotions.  Second, he funneled Sharp Group proceeds to a Washington state corporation that he controlled to pay U.S. promoters, including many of the same promoters he paid via the Sharp Group.  These promotions were misleading because they did not disclose that Stubos, the largest stockholder and an affiliate, was funding the promotions that encouraged potential investors to buy the stock at a time when he would be selling the stock.  Third, Stubos used a foreign entity created by the Sharp Group (the "Belize Nominee") to hire stock promoters.

33.     In June 2013, Stubos asked Sharp to create a nominee entity for Stubos to use to hire stock promoters, adding yet another layer of disguise between Stubos and the stock promotions.  Sharp set up the Belize Nominee in Belize on behalf of Stubos.  In an encrypted xPhone message, Stubos asked Sharp to create an email account for the Belize Nominee so Stubos could contact promoters without having discoverable communications linked to himself: "I will need to be able to interact through this email, supposedly from 'them.'"  Q accounting records show that Sharp charged Stubos $2,900 for the cost to incorporate the Belize Nominee on June 7, 2013.  After Sharp incorporated the Belize Nominee, Stubos used it to hire stock

promoters.  Petrosonic promotions contained misleading fine print stating that the Belize

Nominee, not Stubos (an affiliate of Petrosonic), had paid for the promotions and related

marketing materials.

34.     From June 2012 through October 2014, Stubos directed at least $3.3 million in

payments to various promoters from his illicit Petrosonic trading proceeds using the methods

described above.  Stubos paid for promotions of Petrosonic without disclosing in those

promotions that he was an affiliate of the issuer.  The promotions were thus misleading.  As the

price and trading volume of Petrosonic stock began to rise in response to each of those

promotions, Stubos began selling his shares into the market via the Sharp Group-administered

nominee companies.  This pattern of misleading promotions, followed by Stubos sales to profit

on those promotions, was repeated several times.  From June 2012 through April 2015, Stubos

sold over 23 million shares of Petrosonic using the Sharp Group, generating approximately $18.5

million in net trading proceeds.  The graph below illustrates a series of increases in trading

volume and price that occurred from June 2012 through October 2014 as a result of Stubos'

conduct:



**Partnership with Tobin**

35.     In 2013, Stubos partnered with Morrie Tobin in the Petrosonic scheme.  Tobin

agreed to raise money for Petrosonic from private investors.  These private investors provided an

influx of $3 million to Petrosonic, after which Stubos' promotional efforts and corresponding

stock sales increased substantially.  Stubos paid Tobin approximately $3.4 million dollars

generated from Petrosonic trading proceeds in exchange for Tobin's services related to the

private investments.

**Stubos Manipulated Petrosonic's Stock Price**

36.     While Stubos was selling millions of Petrosonic shares through the Sharp Group

during the promotions he funded, he also directed manipulative trading to drive up the price and

liquidity of the stock he was trying to sell.  This manipulative activity was designed to deceive

investors about the existence of an active market in Petrosonic stock.  Specifically, Stubos

directed Sharp Group traders via encrypted messages strategically to buy Petrosonic stock on

numerous occasions in order to support and/or inflate its price.  For example, on September 9, 2013, Stubos directed a Sharp Group trader to stop selling Petrosonic stock and switch to buying the stock instead: "[W]e should step away from the offers and put some support at the previous low [price.]"  Sharp Group records show that on September 9, Stubos purchased 13,000 shares and sold 72,117 shares.  The buy orders and sell orders were placed from different Sharp Group nominees' brokerage accounts in different countries so that they would not appear linked.  By purchasing small amounts of Petrosonic stock, Stubos was able to increase or maintain its price. Later, Stubos was able to capitalize on the manipulated price and continue to sell.

37.     Stubos was a control person of Petrosonic, because he owned more than 50% of its outstanding stock.  Therefore, he was required to disclose his holdings on filings with the Commission.  Stubos was also required to disclose all of his trading of Petrosonic stock and was subject to limitations on the amount of Petrosonic stock he could sell.  During the Relevant Period, Stubos never disclosed his control over Petrosonic stock and never registered any of his sales of his Petrosonic shares with the Commission as required under the securities laws.

**DEFENDANT'S ENER-CORE FRAUD**

38.     From 2013 through 2014, Stubos engaged in a fraudulent scheme to sell the securities of a second issuer, Ener-Core.  In April 2013, Stubos acquired the public shell company which would later become Ener-Core from another Sharp Group client for $325,000. A shell company is a company that has little to no business operations and/or non-cash assets for an extended period of time.

39.     By acquiring the Ener-Core shell, Stubos gained control of its outstanding stock. Following the purchase, Sharp Group accounting records show Stubos' account received virtually all the purportedly unrestricted and restricted shares of Ener-Core that had been issued

by the company.  As of June 2013, Stubos controlled 99.7% of Ener-Core's purportedly

unrestricted stock.

40.     Beginning in May 2013, for the benefit of Stubos, the Sharp Group transferred his

Ener-Core shares to the nominee companies it supplied,  strategically split those shares into

blocks of stock of less than 5% of the total outstanding stock for each nominee shareholder, and

then deposited those shares with brokerage firms in order to be ready for market sale.  From

November 2013 through October 2014, Stubos directed at least $1.1 million in payments to stock

promoters, including many of the same promoters he used to promote Petrosonic.  Like

Petrosonic, Ener-Core promotional newsletters' fine print misleadingly stated that the Belize

Nominee was the paying party for the promotion.  Similar to the Petrosonic scheme, Stubos

continued to direct all trading in Ener-Core using the Sharp Group and sold the stock during each

promotional campaign that he orchestrated in order to profit from the demand he had created.

From June 2013 through October 2014, Stubos dumped 9.4 million shares of Ener-Core into the

market, generating $2.9 million in net trading proceeds.

**Manipulative Trading**

41.     Before Stubos began aggressively selling Ener-Core shares into the market, he

engaged in manipulative trading to inflate the price of Ener-Core stock and to give a false

appearance of active trading in the market.  For example, from August 23 through September 3,

2013, there was no trading in Ener-Core stock.  In order to reflect trading activity in the stock,

Stubos directed a Sharp Group trader via encrypted messages to start buying and selling the

stock on his behalf.  On September 3, Stubos wrote an encrypted xPhone message with the

subject, ENCR: "We want to show a little bit of activity here on this one.  Nothing big but 15-

20k a day between 1.30 to 1.50 if you can manage so it looks natural…Almost a coincidence."

42.     Nearly every day from September 5 through September 27, the Sharp Group

trader bought and sold Ener-Core stock in amounts ranging from approximately 8,000 to 15,000

shares.  The purchases and sales were made through different overseas brokerage accounts held

in the names of different nominee companies to give the appearance that different shareholders

were trading the stock.  On many of the trading days, the buy and sell quantities matched exactly.

The chart below shows examples of Stubos' trading over that period of time compared to the

total market trading volume and the daily closing price.

| Date | Stubos Buy Volume | Stubos Sell Volume | Total Market Volume | Closing Price | |
|---|---|---|---|---|---|
| 5-Sep-13 | 10,000 | 8,900 | 11,200 | $ | 1.34 |
| 9-Sep-13 | 13,000 | 13,000 | 13,000 | $ | 1.45 |
| 10-Sep-13 | 11,500 | 12,650 | 12,650 | $ | 1.44 |
| 11-Sep-13 | 14,100 | 14,100 | 14,100 | $ | 1.45 |
| 12-Sep-13 | 7,500 | 10,600 | 18,100 | $ | 1.47 |
| 13-Sep-13 | 13,500 | 13,900 | 13,900 | $ | 1.48 |
| 16-Sep-13 | 10,000 | 12,150 | 12,150 | $ | 1.48 |
| 17-Sep-13 | - | 1,000 | 1,000 | $ | 1.48 |
| 18-Sep-13 | 11,500 | 11,500 | 11,500 | $ | 1.46 |
| 19-Sep-13 | 9,900 | 10,300 | 10,400 | $ | 1.48 |
| 20-Sep-13 | 13,000 | 13,000 | 13,000 | $ | 1.49 |
| 23-Sep-13 | 9,500 | 14,200 | 18,900 | $ | 1.49 |
| 25-Sep-13 | 11,000 | 11,000 | 17,000 | $ | 1.48 |
| 26-Sep-13 | 7,600 | 7,500 | 7,600 | $ | 1.49 |
| 27-Sep-13 | 10,400 | 10,000 | 11,000 | $ | 1.50 |

43.     Stubos was explicit in his encrypted messages with Sharp Group personnel about

the purpose of the trading he was directing: to give the appearance to unsuspecting investors that

Ener-Core was actively trading at increasing prices.  On September 25, 2013, Stubos wrote to a

Sharp Group trader, "Keep…on painting that tape [on] encr."  "Painting the tape" colloquially

refers to a deceptive trading device that may involve buying and selling a security, for the

purpose of creating the appearance of active trading in order to increase interest in that stock.

44. Stubos' efforts were successful. The chart below reflects Ener-Core's price and trading volume for August 2013 (the month before Stubos started the manipulative trading) and September 2013 (when Stubos was on both sides of trading for the vast majority of the trading days during the month).



45. Over the next several months, Stubos continued to direct the buying and selling of Ener-Core shares in Sharp Group-administered overseas brokerage accounts. The records from the Q accounting system show that the buy orders and sell orders for these trades were placed through different Sharp Group nominees' brokerage accounts in different countries so they would not appear to be connected. From September 5, 2013 through December 31, 2013, Stubos was on both sides of Ener-Core trading for 54 of the 72 possible trading days.

**PROFITS AND TRANSFERS TO RELIEF DEFENDANT**

46. As discussed above, from June 2012 through April 2015, Stubos sold over 23 million shares of Petrosonic using the Sharp Group, generating approximately $18.5 million in

net trading proceeds. Q accounting records show that after costs including promotions and the distributions to Tobin, Stubos' Q account (the "LION Account") received approximately $10 million in net profits derived from Petrosonic trading.

47.     Likewise, from June 2013 through October 2014, Stubos dumped 9.4 million shares of Ener-Core into the market, generating $2.9 million in net trading proceeds.  Q accounting records show that approximately $930,000 of those proceeds were transferred to the LION Account.

48.     Stubos then used the LION Account for his personal benefit, including directing over CAD $1.5 million in payments to himself and the venture capital firm he owned.  The Lion Account also show Stubos receiving over CAD $1.9 million in cash and gold coins.  Lastly, Stubos directed the Sharp Group to wire approximately $3.6 million from his illicit trading proceeds to an account he controlled at a Panamanian broker-dealer firm (the "Panamanian Account").

49.     The xPhone messages show Stubos directing Sharp Group employees to issue various wires from his LION Account to the Panamanian Account.  In particular, Stubos, directly or indirectly, transferred $553,500 to the Panamanian Account on or about July 18, 2013 and $1,252,000 on or about January 10, 2014.  In total, Q accounting records show Stubos directed over $3.6 million of proceeds directed from the Sharp Group to the Panamanian Account.

50.     In May 2014, wires for approximately $1.3 million were sent from the broker-dealer holding the Panamanian Account to a title company in California to purchase a property in Palm Springs, California in the name of Dori-Ann Stubos, George Stubos' wife.  Through this transfer, Stubos gave his illicit sale proceeds to Dori-Ann Stubos for no legitimate purpose or consideration.

**ADDITIONAL ISSUERS' PENNY STOCK SOLD BY STUBOS**

51.     In addition to the stock of Petrosonic and Ener-Core, Stubos' scheme involved utilizing the Sharp Group to control and sell the penny stock of other Issuers.  For example, during 2013, Stubos, directly or indirectly, transferred purportedly unrestricted stock of Homie Recipes, Inc. ("Homie") to the Sharp Group.  The stock was divided and distributed to Sharp Group-administered nominee companies in blocks of less than 5% of the company's outstanding stock.  In December 2015, Stubos expressed displeasure to Sharp about the amount it was costing him to maintain Homie and its stock in Sharp's custody and Sharp suggested that Stubos might be able to sell the Homie shell company to another of his clients.  Stubos responded that he would be "happy" to sell.  In August 2017, according to the Q system, Sharp managed the sale of Homie and its stock to another one of his clients.  Stubos received a payment of $260,000 for the shell.  The Sharp client who bought the Homie shell changed its name and then sold its stock in connection with his own promotional activities.

52.     Stubos also appears to be involved, at least in part, with a similar scheme involving a fourth issuer, Synergy CHC Corp ("Synergy").  Through various encrypted xPhone messages concerning Synergy, Stubos revealed his understanding of the illegal nature of his actions and his fear of being discovered.  For example, on September 16, 2014, Stubos messaged Kelln, a Sharp Group employee responsible for dividing and distributing stock to Sharp Group nominee companies:

> From: Celt (Kelln)
> To:  77 (Stubos)
> Subject: Just a thought
>
> The shares are register to S1 holders.  We can lift their signatures and use their shares to vote instead of transferring them all to nominees.  Up to you.
>
> From: Lion (Stubos)

To: Celt (Kelln)
Subject: Re: Just a thought

Ok do it that way.  Easy.  Let's not talk on the phone anymore.  Really scares
the shit out of me….Easy.  Sorry to be blunt, but shit is scary out there and they are
listening, who knows?  Paranoid is good.

53.     In another encrypted xPhone message, Stubos directed Kelln to provide votes for

a Synergy stockholder meeting on September 24, 2014, demonstrating his control over the

nominee companies that were the shareholders on paper.  On September 17, 2014, Stubos

messaged Kelln "vote all that we can for the resolutions with management."  Kelln asked if he

needed names and he responded "No I just need the votes."  On September 22, 2014, Stubos

again messaged Kelln about whether she could facilitate online voting instead of paper voting.

When she questioned how the process worked, Stubos responded, "I don't f'n know? And my

moron partner just emailed the whole fucking thing to MY email."  Stubos last email to Kelln

demonstrates his concern that evidence of his fraudulent conduct would be traceable to him

through his personal email.

**FIRST CLAIM FOR RELIEF**
**FRAUD IN THE OFFER OR SALE OF SECURITIES**
**(Violations of Sections 17(a)(1) and (3) of the Securities Act by Stubos)**

54.     Paragraphs 1 through 53 above are re-alleged and incorporated by reference as if

fully set forth herein.

55.     By reason of the conduct described above, Stubos, in the offer or sale of

securities, by the use of the means or instrumentalities of interstate commerce or of the mails,

directly or indirectly, acting intentionally, knowingly, recklessly or negligently (i) employed

devices, schemes, or artifices to defraud; and (ii) engaged in transactions, practices, or courses of

business which operated or would operate as a fraud or deceit upon any persons, including

purchasers or sellers of the securities.

56.     By reason of the conduct described above, Stubos violated Sections 17(a)(1) and

(3) of the Securities Act [15 U.S.C. §77q(a)(1) and (3)] and will continue to violate those

sections unless restrained and enjoined.

**SECOND CLAIM FOR RELIEF**
**FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES**
**(Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) by Stubos.)**

57.     Paragraphs 1 through 53 above are re-alleged and incorporated by reference as if

fully set forth herein.

58.     By reason of the conduct described above, Stubos, directly or indirectly, in

connection with the purchase or sale of securities, by the use of the means or instrumentalities of

interstate commerce or of the mails, or of any facility of any national securities exchange,

intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud;

and (ii) engaged in acts, practices, or courses of business which operated or would operate as a

fraud or deceit upon any persons, including purchasers or sellers of the securities.

59.     By reason of the conduct described above, Stubos violated, and unless restrained

and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and

Rules 10b-5(a) and (c) [17 C.F.R. §240.10b-5(a) and 5(c)] thereunder.

**THIRD CLAIM FOR RELIEF**
**MARKET MANIPULATION**
**(Violations of Section 9(a)(2) of the Exchange Act by Stubos)**

60.      Paragraphs 1 through 53 above are re-alleged and incorporated by reference as if

fully set forth herein.

61.     By reason of the conduct described above, Stubos effected, alone or with one or

more other persons, a series of transactions in at least one security that was not a government

security, that created actual or apparent active trading in that security, or raised or depressed the price of that security, for the purpose of inducing the purchase or sale of that security by others.

62.     By engaging in the conduct described above, Stubos violated, and unless restrained and enjoined will continue to violate, Section 9(a)(2) of the Exchange Act [15 U.S.C. § 78i(a)(2)].

### FOURTH CLAIM FOR RELIEF
### OTHER EQUITABLE RELIEF, INCLUDING UNJUST ENRICHMENT AND CONSTRUCTIVE TRUST
### (against Dori-Ann Stubos)

63.     Paragraphs 1 through 53 above are re-alleged and incorporated by reference as if fully set forth herein.

64.     Section 21(d)(5) of the Exchange Act [15 U.S.C. §78u(d)(5)] states "In any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors."

65.     Dori-Ann Stubos received investor funds derived from the unlawful acts, practices and scheme of George Stubos under circumstances dictating that, in equity and good conscience, she should not be allowed to retain such funds.

66.     Further, specific property acquired or improved by Dori-Ann Stubos is traceable to George Stubos' wrongful acts, and there is no reason in equity why she should be entitled to retain that property.

67.     As a result, Dori-Ann Stubos is liable for unjust enrichment and should be required to return her ill-gotten gains, in an amount to be determined by the Court.  The Court should also impose a constructive trust on property in the possession of Dori-Ann Stubos that is traceable to George Stubos' wrongful acts.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a Judgement that:

A.       Permanently restrains and enjoins Stubos and his agents, servants, employees and attorneys, and those persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, from:

1.       violating Section 17(a) of the Securities Act [15 U.S.C. §§77q(a)], violating Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5], and violating Section 9(a) of the Exchange Act [15 U.S.C. §78i(a)]; and

2.       directly or indirectly, including but not limited to, through any entity he owns or controls, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent him from purchasing or selling securities listed on a national securities exchange for his own personal account;

B.        Bars Stubos from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. §77t(g)] and/or 21(d) of the Exchange Act [15 U.S.C. §78u(d)];

C.       Orders Stubos to disgorge, with prejudgment interest, all ill-gotten gains obtained by reason of the unlawful conduct alleged in this Complaint pursuant to Section 21(d)(7) of the Exchange Act [15 U.S.C. §78u(d)(7)];

D.       Orders Dori-Ann Stubos to disgorge, with prejudgment interest, all ill-gotten gains obtained by reason of the unlawful conduct alleged in the Complaint;

F.       Retains jurisdiction over this action to implement and carry out the terms of all

23

orders and decrees that may be entered; and

G.      Grants such other and further relief as this Court may deem just and proper.

## JURY DEMAND

The Commission demands a jury in this matter for all claims so triable.

DATED:  June 6, 2022.

Respectfully submitted,

_/s/ Nita K. Klunder_____
Nita Klunder
Kathleen Burdette Shields*
Jennifer A. Cardello *
Amy Gwiazda *

SECURITIES AND EXCHANGE COMMISSION
Boston Regional Office
33 Arch St., 24th Floor
Boston, MA 02110
Phone: 617-573-8904 (Shields), 617-573-4577 (Cardello),
Fax: 617-573-4590
shieldska@sec.gov; cardelloj@sec.gov

*Not admitted in the U.S. District Court for the Southern
District of New York