UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------X
                                                                    :
SECURITIES AND EXCHANGE COMMISSION,                                 :
                                                                    :
                                        Plaintiff,                  :
                                                                    :
                        -v-                                         :
                                                                    :
GEORGE STUBOS, et al.,                                              :
                                                                    :
                                        Defendants.                 :
                                                                    :
--------------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 10/10/2022
```

22-cv-04674 (LJL)

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

        The United States Securities and Exchange Commission ("SEC") brings this action

against Defendant George Stubos ("Stubos") and Relief Defendant Dori-Ann Stubos ("Dori-

Ann") (collectively, "Defendants").  The SEC alleges claims against Stubos for fraud in the offer

or sale of securities in violation of Section 17(a)(1) and (3) of the Securities Act of 1933

("Securities Act"), 15 U.S.C. § 77q(a)(1), (3), fraud in connection with the purchase or sale of

securities in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange

Act"), 15 U.S.C. § 78j(b), and Rules 10b-5(a), (c) thereunder, 17 C.F.R. § 240.10b-5(a), (c), and

market manipulation in violation of Section 9(a)(2) of the Exchange Act, 15 U.S.C. § 78i(a)(2).

Dkt. No. 1.  The SEC also seeks equitable relief against Dori-Ann as a relief defendant on

theories of unjust enrichment and constructive trust.  *Id.*

        Defendants move the Court for an order dismissing the complaint pursuant to Federal

Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction, Federal Rule of Civil

Procedure 12(b)(6) for failure to state a claim for relief and as time-barred by the statute of

limitations, and Federal Rule of Civil Procedure 9(b) for failure to plead fraud with particularity.[1] Dkt. No. 42.  For the reasons that follow, the motion to dismiss is denied.

## BACKGROUND

The SEC's complaint in this case ("Complaint") alleges a pump-and-dump scheme.[2] According to the Complaint, Stubos engaged in a sophisticated scheme from at least March 2012 through at least April 2015 in which he fraudulently concealed from investors that he, in concert with others, controlled the stock of at least two small and thinly traded U.S. companies.  Dkt. No. 1 ¶ 1.  While concealing his control of the companies, Stubos sought to increase demand for the companies' stock through funding various promotions touting the stock.  *Id.* ¶¶ 2–3.  As the price and trading value of the stock increased as a result of the promotions, Stubos secretly sold shares into the market.  *Id.* ¶ 3.  Stubos also allegedly engaged in manipulative trading that created the false perception of active trading in the penny stocks.  *Id.* ¶¶ 4, 36–37, 41–45.

Stubos is a Canadian citizen and resident of Vancouver, British Columbia, Canada.  *Id.* ¶ 11.  In June 2007, he was barred by the British Columbia Securities Commission from participating in the securities industry or acting as a director or officer of any issuer for two years and from participating in any investor relations activities for two years.  *Id.*  In September 1998, Stubos was barred by the Vancouver Stock Exchange ("Exchange") from the Exchange for one year followed by one year of supervision and was ordered to pay fines and disgorgement for trading in a client account without the client's permission.  *Id.* ¶ 11.

---

[1] Defendants moved the Court, in the alternative, for a stay pending the decision of the Second Circuit in *SEC v. Ahmed*, Nos. 21-1686(L), 21-1712(CON).  Dkt. No. 42.  The Court denied that request on September 30, 2022.  Dkt. No. 49.
[2] The Court accepts as true for the purposes of this motion the well-pleaded allegations of the Complaint.

Dori-Ann is a Canadian citizen and resident of Vancouver, Canada. *Id.* ¶ 12. She is the wife of Stubos. *Id.*

The Complaint focuses on two companies that were vehicles of Stubos's fraud, and whose stock he controlled, promoted, manipulated, and sold. The first company is Petrosonic Energy Inc. ("Petrosonic"), a Nevada corporation with its principal place of business in Los Angeles, California, purportedly in the business of petroleum refining. *Id.* ¶ 14. The second company is Ener-Core, Inc. ("Ener-Core"), a Delaware corporation with its principal place of business in Laguna Niguel, California, purportedly engaged in the business of designing and manufacturing systems producing continuous energy. *Id.* ¶ 15. The common stock of both companies was registered with the SEC under Section 12(g) of the Exchange Act. *Id.* ¶¶ 14–15. Both Petrosonic and Ener-Core were quoted on OTC Link, which was operated by the OTC Markets Group, Inc., a stock quotation service based in New York that facilitates the public trading of shares in public companies that are not otherwise listed on national securities exchanges. *Id.* ¶¶ 14–15, 18–19.[3]

Stubos effectuated the fraud utilizing the illicit services of Frederick L. Sharp and his employees (the "Sharp Group"). *Id.* ¶ 24. During the relevant period, the Sharp Group helped facilitate illegal stock sales in the public securities markets and helped its clients who were public company control persons conceal their identities when selling the stock of companies they controlled. *Id.* ¶ 25. In order to help its clients conceal their identities as control persons, the Sharp Group offered a variety of services including: forming and providing offshore nominee

---

[3] In addition to the stock of Petrosonic and Ener-Core, Stubos's scheme involved the utilization of the Sharp Group to control and sell the penny stock of other issuers, including Homie Recipes, Inc. and Synergy CHC Corp. *Id.* ¶¶ 51–52.

companies that held shares for undisclosed control persons; arranging for clients to deposit stock in offshore trading platforms to obfuscate the control person's association with their public company penny stock; and providing and administering an encrypted communication network by purchasing, configuring, and delivering devices which the Sharp Group referred to as "xPhones." *Id.* ¶ 26.  The Sharp Group also administered a proprietary accounting system that tracked a client's total stock holdings and sales across various nominee shareholders and trading platforms; paid out the proceeds of illegal stock sales at the client's direction to accounts around the world and/or to the client's internal accounts with the Sharp Group; arranged to route such payments by circuitous methods designed to conceal the source of funds; and fabricated documents, such as invoices, to conceal the nature and source of the payments.  *Id.* ¶ 27.

Stubos became a client of the Sharp Group in 2012.  *Id.* ¶ 28.  Shortly after, he transferred his control position in Petrosonic to the Sharp Group; as of December 2012, Stubos, through the Sharp Group, held 56% of its outstanding shares and therefore was an "affiliate" (*i.e.*, someone who either controls, is controlled by, or under common control with, an issuer) of Petrosonic.  *Id.* ¶¶ 17, 28.  Using various nominee companies supplied by the Sharp Group, "Stubos caused the Sharp Group to strategically split" his holdings of Petrosonic stock into blocks of less than 5% of the total outstanding stock to be held in the name of each nominee company.  *Id.* ¶ 29.  This splitting of his holdings was performed to avoid reporting requirements and restrictions and scrutiny by brokerage firms and other market participants like transfer agents.  *Id.* ¶¶ 29, 31.

From 2012 through 2014, Stubos secretly funded promotions of Petrosonic stock to generate investor interest in the stock, increase demand for the stock, and drive up Petrosonic's stock price and trading volume.  *Id.* ¶ 32.  To hide his involvement, he used the Sharp Group to make payments to various stock promoters, funneled Sharp Group proceeds to a Washington

state corporation that he controlled to pay U.S. promoters, and used a foreign entity created by the Sharp Group to hire stock promoters. *Id.* ¶¶ 32–33. The promotions did not disclose that they were paid for by an affiliate of the issuer. *Id.* ¶ 34. As the price and trading volume of Petrosonic stock began to rise in response to each of the promotions, Stubos began selling his shares into the market via the Sharp Group-administered nominee companies. *Id.* In all, Stubos generated approximately $18.5 million in net trading proceeds. *Id.* "While Stubos was selling millions of shares of Petrosonic penny stock through the Sharp Group during the promotions he funded, he also directed manipulative trading to drive up the price and liquidity of the stock he was trying to sell." *Id.* ¶ 36.

From 2013 through 2014, Stubos engaged in a similar scheme involving the securities of Ener-Core. *Id.* ¶ 38. In April 2013, he purchased the public shell company which later became Ener-Core from another Sharp Group client for $325,000. *Id.* ¶ 38. Following the purchase, Stubos's account at Sharp Group held virtually all of the purportedly unrestricted and restricted shares of Ener-Core that had been issued by the company and Stubos controlled over 99% of the company's purportedly unrestricted stock as of June 2013. *Id.* ¶ 39. Beginning in May 2013, the Sharp Group transferred Stubos's Ener-Core holdings to its nominee companies, splitting those shares into blocks of less than 5% of the total outstanding stock; it then deposited those shares with brokerage firms in order to be ready for sale to the market. *Id.* ¶ 40.

After building up his position in Ener-Core, Stubos directed at least $1.1 million in payments to stock promoters to promote Ener-Core. *Id.* The promotional newsletter stated that the Belize Nominee was the paying party for the promotion and did not disclose Stubos's role. *Id.* Stubos then directed Sharp Group to sell his shares of Ener-Core stock during the promotional campaign—secretly selling 9.4 million shares of Ener-Core penny stock for net

trading proceeds of $2.9 million.  *Id.*  Before Stubos began selling his Ener-Core stock and during the period from September 5, 2013 through December 31, 2013, Stubos engaged in manipulative trading to inflate Ener-Core's stock price and to create the false appearance of active trading in the market.  *Id.* ¶¶ 41–45.

After engaging in these schemes, the proceeds of Stubos's sales of Petrosonic and Ener-Core stock were transferred to Stubos's account, which he used for his personal benefit.  *Id.* ¶¶ 46–47.  Stubos also directed the Sharp Group to wire approximately $3.6 million of his improper trading proceeds to an account he controlled at a Panamanian broker-dealer firm (the "Panamanian Account").  *Id.* ¶¶ 48–49.  In May 2013, approximately $3.6 million was wired from the broker-dealer holding the Panamanian Account to a title company in California, which in turned purchased a property in Palm Springs, California in the name of Dori-Ann Stubos.  *Id.* ¶ 50.  The SEC alleges that: "Through this transfer, Stubos gave his illicit sale proceeds to Dori-Ann Stubos for no legitimate purpose or consideration."  *Id.*

Stubos generated approximately $11 million in illicit profits from his sales of Petrosonic and Ener-Core shares.  *Id.* ¶ 2.

## PROCEDURAL HISTORY

The SEC filed its Complaint on June 6, 2022.  *Id.*  The Complaint alleges claims against Stubos for fraud in the offer or sale of securities in violation of Section 17(a)(1) and (3) of the Securities Act, fraud in connection with the purchase or sale of securities in violation of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder, and market manipulation in violation of Section 9(a)(2) of the Exchange Act.  *Id.* ¶¶ 54–62.  The Complaint also includes a claim for other equitable relief, including unjust enrichment and constructive trust, against Dori-Ann.  *Id.* ¶¶ 63–67.  On the basis of these allegations, the SEC seeks (1) a permanent injunction against Stubos, enjoining him from engaging in the transactions, acts, practices and courses of

business alleged in the Complaint; (2) disgorgement of all ill-gotten gains from the unlawful

conduct alleged in the Complaint, together with prejudgment interest; (3) an order barring Stubos

from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities

Act and/or Section 21(d) of the Exchange Act; and (4) a conduct-based injunction enjoining

Stubos from directly or indirectly participating in the issuance, purchase, offer, or sale of any

security.  *Id.* ¶ 6.  The SEC also seeks relief against Dori-Ann for her receipt of the proceeds of

Stubos's unlawful acts.  *Id.* ¶ 7.

Defendants filed their motion to dismiss the Complaint and accompanying memorandum

of law on July 29, 2022.  Dkt. Nos. 42–43.  The SEC filed a memorandum of law in opposition

to the motion on September 2, 2022.  Dkt. No. 44.[4]  The Defendants filed their reply

memorandum of law in further support of the motion to dismiss on September 14, 2022.  Dkt.

No. 46.

## LEGAL STANDARD

"A court facing challenges as to both its jurisdiction over a party and the sufficiency of

any claims raised must first address the jurisdictional question" and must dismiss the action

against any defendant over whom it lacks personal jurisdiction.  *Lugones v. Pete & Gerry's*

*Organic, LLC*, 2020 WL 871521, at *2 (S.D.N.Y. Feb. 21, 2020) (quoting *Cohen v. Facebook,*

*Inc.*, 252 F. Supp. 3d 140, 148 (E.D.N.Y. 2017)); *see* Fed. R. Civ. P. 12(b)(2).  "On a Rule

12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of

showing that the court has jurisdiction over the defendant."  *Metro. Life Ins. Co. v. Robertson-*

*Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996).  "[T]he showing a plaintiff must make to defeat a

---

[4] On September 7, 2022, the SEC filed a notice of supplemental authority, drawing the attention
of the Court to the decision of the United States District Court for the District of Massachusetts
in *Securities and Exchange Commission v. Sharp, et al.*, No. 21-11276-WGY (D. Mass. Sept. 6,
2022).  Dkt. No. 45.

defendant's claim that the court lacks personal jurisdiction over it 'varies depending on the procedural posture of the litigation.'" *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)).  Prior to discovery, a plaintiff need make only a prima facie showing of personal jurisdiction over the defendants.  *Id.* at 84.  This prima facie showing "must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant."  *Id.* at 85.  While the Court "construe[s] the pleadings and affidavits in the light most favorable to plaintiffs," *id.* (citation omitted), the Court "will not draw argumentative inferences in the plaintiff's favor" and need not "accept as true a legal conclusion couched as a factual allegation," *In re Terrorist Attacks on Sept. 11, 2011*, 714 F.3d 659, 673 (2d Cir. 2013) (citation omitted).

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.  Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]."  *Twombly*, 550 U.S. at 556; *accord Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).  However, although the Court must accept all the factual allegations of a complaint as true, it is "not bound to accept as true a legal conclusion couched as a factual

allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  The ultimate issue "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 235–36 (1974)); *see also DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 113 (2d Cir. 2010) ("In ruling on a motion pursuant to Fed. R. Civ. P. 12(b)(6), the duty of a court is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." (internal quotation marks and citation omitted)).

 "Although the statute of limitations is ordinarily an affirmative defense that must be raised in the answer, a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint." *Ellul v. Congregation of Christian Brothers.*, 774 F.3d 791, 798 n.12 (2d Cir. 2014); *see also Ghartey v. St. John's Queens Hosp.*, 869 F.2d 160, 162 (2d Cir. 1989) ("Where the dates in a complaint show that an action is barred by a statute of limitations, a defendant may raise the affirmative defense in a pre-answer motion to dismiss.").

## DISCUSSION

Defendants move to dismiss the claims against Stubos on three grounds: (1) the Court lacks personal jurisdiction over Stubos; (2) the claims in the Complaint are time-barred; and (3) the allegations of the Complaint fail to state a claim for relief under any of the statutes pleaded. Defendants also move to dismiss the claim against Dori-Ann on the basis that no such claim can survive in the absence of a viable claim against Stubos.

## I.      Personal Jurisdiction

"[T]he Securities Exchange Act permits the exercise of personal jurisdiction to the limit of the Due Process Clause of the Fifth Amendment." *S.E.C. v. Unifund SAL*, 910 F.2d 1028,

1033 (2d Cir. 1990); *see Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326, 1340 (2d Cir. 1972) (Friendly, J.) ("[I]t is reasonable to infer that Congress meant to assert personal jurisdiction over foreigners not present in the United States [] but, of course, not beyond the bounds permitted by the due process clause of the Fifth Amendment.").  The Due Process Clause of the Fifth Amendment "has two related components: the 'minimum contacts inquiry' and the 'reasonableness' inquiry."  *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996).

For the minimum contacts inquiry, a court must determine "whether the defendant has sufficient contacts with the forum state to justify the court's exercise of personal jurisdiction." *Id.*  Where the plaintiff alleges violations of the federal securities laws, "the minimum-contacts test . . . looks to contacts with the entire United States rather than with the forum state.'"  *S.E.C. v. Straub*, 921 F. Supp. 2d 244, 253 (S.D.N.Y. 2013) (Sullivan, J.) (citation omitted); *see S.E.C. v. Sharef*, 924 F. Supp. 2d 539, 544 (S.D.N.Y. 2013) ("A nonresident defendant sued under the Exchange Act need not have minimum contacts with the state seeking to exercise personal jurisdiction; rather the only contacts required are with the United States as a whole."); *S.E.C. v. Softpoint, Inc.,* 2001 WL 43611, at *3–4 (S.D.N.Y. Jan. 18, 2001) (Lynch, J.).  The "foreign actor's activity in relation to the United States" therefore must be "sufficiently extensive and regular to make the possibility of litigation in the United States a foreseeable risk of the business."  *Straub*, 921 F. Supp. 2d at 254 (alterations adopted) (quoting *Leasco,* 468 F.2d at 1341 n.11).

If the defendant has minimum contacts with the forum state, the court then turns to whether the exercise of personal jurisdiction would be reasonable under the circumstances of the

case.  *See Softpoint, Inc.,* 2001 WL 43611, at *2.  In determining the reasonableness of

exercising jurisdiction in connection with a particular defendant, courts must evaluate:

> (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the
> interests of the forum state in adjudicating the case; (3) the plaintiff's interest in
> obtaining convenient and effective relief; (4) the interstate judicial system's interest
> in obtaining the most efficient resolution of the controversy; and (5) the shared
> interest of the states in furthering substantive social policies.

*Metro. Life Ins.*, 84 F.3d at 568 (citing *Asahi Metal Indus. Co. v. Superior Ct. of California,*

*Solano Cnty.*, 480 U.S. 102, 113–14 (1987)).

Personal jurisdiction "may be defeated where the defendant presents 'a compelling case

that the presence of some other considerations would render jurisdiction unreasonable.'"  *Id.*

(quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)).  The burden is on the

defendant to demonstrate that the assertion of jurisdiction in the forum will "make litigation 'so

gravely difficult and inconvenient' that a party unfairly is at a 'severe disadvantage' in

comparison to his opponent."  *Burger King*, 471 U.S. at 478 (citation omitted).  "The

reasonableness inquiry is largely academic in non-diversity cases brought under a federal law

which provides for nationwide service of process because of the strong federal interests

involved."  *Straub*, 921 F. Supp. 2d at 259 (quoting *S.E.C. v. Syndicated Food Servs. Int'l, Inc.,*

2010 WL 3528406, at *3 (E.D.N.Y. Sept. 3, 2010)); *accord Softpoint,* 2001 WL 43611, at *5.

Stubos argues that this Court lacks personal jurisdiction over him, as he is a Canadian

citizen living and working in Canada during the relevant period and there is no allegation that he

"ever traded in, traveled to, or otherwise targeted the United States to further the purported

scheme."  Dkt. No. 43 at 15.  He also claims that it would violate due process for the Court to

assert jurisdiction over him based on the activity of third parties—here, the Sharp Group.  *Id.*  In

response, the SEC argues that personal jurisdiction is sufficiently supported by allegations,

among others, that Stubos "directed thousands of trades for Petrosonic and Ener-Core stock

utilizing and manipulating the quotation services provided for those stocks by OTC Markets located in New York City" and that his sale of those shares "directly impacted U.S. investors who purchased those shares."  Dkt. No. 44 at 21.  The SEC states that "Stubos' use and manipulation of the quotation services provided by New York's OTC Markets to sell stock to investors throughout the United States alone satisfies the minimal contacts requirement."  *Id.*

The SEC has pleaded sufficient facts to establish a basis for personal jurisdiction. Accepting the facts as alleged by the SEC in the Complaint, Stubos directed the sale of millions of his own shares of Petrosonic and Ener-Core (both U.S. companies) on the public market using the U.S. Over-the-Counter ("OTC") Markets based in New York City and thereby induced U.S. investors to buy his interest in those companies.  Dkt. No. 1 ¶¶ 1–3, 18, 32–37, 40–45.  As part of the same scheme, he also engaged in manipulative trading of Ener-Core shares using the services of the U.S. OTC Markets to create the false appearance of active trading and to inflate the price of the stock, *id.* ¶¶ 36, 41–45, 47, and funneled Sharp Group proceeds to a Washington state corporation that he controlled to pay U.S. promoters for Petrosonic and Ener-Core stock in furtherance of his scheme, *id.* ¶¶ 32–33.  Those facts are sufficient to demonstrate that Stubos engaged in activity abroad that had a "direct and unmistakably foreseeable effect within the United States."  *Unifund*, 910 F.2d at 1033; *see Straub*, 921 F. Supp. 2d at 253–56.  Stubos's activities "created the near certainty that United States shareholders . . . would be adversely affected."  *Softpoint*, 2001 WL 43611, at *6 (quoting *Unifund*, 910 F.2d at 1033); *see Leasco*, 468 F.2d at 1341 (the effect must occur "as a direct and foreseeable result of the conduct outside the territory." (citation omitted)).

It is insufficient that Stubos is a Canadian citizen who did not step foot in the United States during the relevant time period.  The SEC is not powerless to prosecute those who violate

the securities laws of the United States from abroad.  *See Unifund*, 910 F.2d at 1033 (personal

jurisdiction extends to one who commits insider trading from abroad); *Straub*, 921 F. Supp. 2d at

254 ("[A] defendant's physical absence from a forum is insufficient to defeat personal

jurisdiction.").  Nor is it fatal that Stubos allegedly committed his fraud through the offices of the

Sharp Group, rather than directly.  While the Due Process test looks to the contacts "that the

'defendant *himself*' creates with the forum State," *Walden v. Fiore*, 571 U.S. 277, 284 (2014)

(quoting *Burger King Corp.*, 471 U.S. at 475), "[i]t is well established that a defendant can

'purposefully avail itself of a forum by directing its agents or distributors to take action there,'"[5]

*Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 84 (2d Cir. 2018) (quoting *Daimler

AG v. Bauman*, 571 U.S. 117, 135 (2014)).  This is also not "the rare case where the

reasonableness analysis defeats the exercise of personal jurisdiction."  *Straub*, 921 F. Supp. 2d at

259.  While Defendants may prefer to litigate this case in a different country, Defendants do not

even argue that the "'burden on them would be 'severe' or 'gravely difficult.'"  *Id.*

The district court decision in *S.E.C. v. Carrillo Huettel LLP*, 2014 WL 12785242

(S.D.N.Y. June 4, 2014), which Defendants rely on in arguing that personal jurisdiction does not

exist, is not to the contrary.  In that case, the district court denied the SEC's request to amend its

---

[5] Contrary to Defendants' contention, the SEC's allegations that Defendants controlled the activities of the Sharp Group do not amount to a "pleading deficiency."  Dkt. No. 43 at 17 n.13 (quoting *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 85–86 (2d Cir. 2018)).  The Complaint includes specific allegations about the "relationship between" Stubos and the Sharp Group as well as allegations from which the Court may "determine" which of "the broker-dealer's contacts should be imputed to" Stubos.  *Bank of Am. Corp.*, 883 F.3d at 85–86.  The Complaint alleges that Stubos became a client of the Sharp Group in 2012, *see* Dkt. No. 1 ¶ 28, includes text messages in which Stubos directs the activities of the Sharp Group, *id.* ¶ 30, and details each of the activities in furtherance of the scheme that Stubos directed the Sharp Group to undertake, *see, e.g., id.* ¶ 33 ("Stubos asked Sharp to create a nominee entity . . . .");  *id.* ¶ 36 ("Stubos directed Sharp Group traders via encrypted messages strategically to buy Petrosonic stock . . . .").

claims against a defendant to add allegations that the defendant (a Mexican national) directed his Canadian broker to sell shares of stock that were the subject of a pump-and-dump scheme to a United States purchaser. *Id.* at *4. In denying the request, the court noted that the SEC conceded that the defendant had given his son (another defendant in the case) trading authority and power of attorney over the relevant brokerage account. *Id.* In light of the known trading authority and power of attorney of the son over the account, the court concluded that the "proposed amended claims" give "no factually based indication of who was actually directing the sale of stock from [the] brokerage account." *Id.* In this case, by contrast, the allegations of the Complaint—which the Court must accept as true—establish that it was only ever Stubos who was directing the sale of his own shares by the Sharp Group. Accordingly, the SEC has properly alleged personal jurisdiction over Stubos.

## II.    Statute of Limitations

Stubos also moves to dismiss the SEC's claims against him—which were filed over seven years after the claims accrued—as time-barred. Dkt. No. 43 at 7. For purposes of this argument, Stubos must accept the SEC's allegations as true. *See Nastasi & Assocs., Inc. v. Bloomberg, L.P.*, 2022 WL 4448621, at *6 (S.D.N.Y. Sept. 23, 2022). According to those allegations, over a period of three years, Stubos defrauded numerous retail investors of millions of dollars and Stubos and his wife are still in retention of those ill-gotten proceeds. Dkt. No. 1 ¶¶ 1–2, 46–50. The SEC seeks to have him disgorge the proceeds in favor of the investors who were injured and alleges that Stubos presents a continuing risk that he will violate the securities laws in the future. *Id.* ¶ 6.

Stubos's argument centers on whether the five-year statute of limitations contained in 28 U.S.C. § 2462 or the ten-year statute of limitations contained in the National Defense

Authorization Act for Fiscal Year 2021 ("NDAA"), which was passed in January 2021, governs the SEC's claims for injunctive relief and disgorgement.

Section 2462 imposes a five-year statute of limitations on any enforcement action for a "civil fine, penalty, or forfeiture."  28 U.S.C. § 2462.  Specifically, it provides:

> Except as otherwise provided by Act of Congress, an action, suit, or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five year from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon.[6]

*Id.*  A claim accrues under Section 2462 when the defendant's allegedly fraudulent conduct occurs.  *Gabelli v. S.E.C.*, 568 U.S. 442, 448 (2013).

Although there had been disagreement among courts about whether the statute of limitations in Section 2462 applied to disgorgement actions brought by the SEC, the Supreme Court in *Kokesh v. S.E.C.*, 37 S. Ct. 1635 (2017), answered this question in the affirmative.  The Court held that the "5-year statute of limitations in § 2462 [] applies when the SEC seeks disgorgement" as "[d]isgorgement, as it is applied in SEC enforcement proceedings, operates as a penalty."  *Id.* at 1641–45.  Thus, the SEC could not seek disgorgement for wrongful acts committed more than five years prior to the SEC bringing an enforcement action.  The Court further limited the SEC's disgorgement power in *Liu v. Sec. & Exch. Comm'n*, 140 S. Ct. 1936 (2020).  In *Liu*, the Court held that the SEC could not seek disgorgement as equitable relief unless it did not "exceed a wrongdoer's net profits and [was] awarded for victims."  *Id.* at 1940.

On January 1, 2021, after the Court's decisions in *Kokesh* and *Liu*, Congress enacted the NDAA, Pub. L. No. 116-283, § 6501, 134 Stat. 3388, 4626 (2021).  The NDAA, in relevant part,

---

[6] The SEC does not argue that proper service could not be made because the offender was not found within the United States.  In fact, it has submitted evidence of Stubos's travel to the United States during the relevant period.  Dkt. Nos. 44-1, 44-2.

extended the statute of limitations for SEC scienter-based claims for disgorgement to ten years and created a ten-year statute of limitations for equitable remedies including injunctions and bars.  15 U.S.C. § 78u(d)(8)(A)–(B).  As pertinent here, the NDAA provides: "The Commission may bring a claim for disgorgement . . . (ii) not later than 10 years after the latest date of the violation that gives rise to the action or proceeding in which the Commission seeks the claim if the violation involves conduct that violates – (I) section 78j(b) of this title; (II) section 77q(a)(1) of this title; . . . or (IV) any other provision for which scienter must be established."  *Id.* § 78u(d)(8)(A).  The NDAA also provides: "The Commission may seek a claim for any equitable remedy, including for an injunction or for a bar, suspension, or cease and desist order, not later than 10 years after the latest date on which a violation that gives rise to the claim occurs."  *Id.* § 78u(d)(8)(B).  The relevant provision of the NDAA details that the amendments, including the Act's alteration of the statute of limitations, "apply with respect to any action or proceeding that is pending on, or commenced on or after" January 1, 2021.  NDAA § 6501(a)(3).

Defendants argue that the five-year statute of limitations in Section 2462 applies to the SEC's claims, rather than the ten-year statute of limitations in the NDAA.[7]  According to Defendants, the statute of limitations in Section 2462 bars both the SEC's claims for disgorgement and injunctive relief, Dkt. No. 43 at 8–9, and the NDAA does not revive those time-barred claims against him.  Specifically, Defendants argue that: (i) the NDAA does not apply to the SEC's non-scienter-based claim under Section 17(a)(3) for civil remedies, *id.* at 10,

---

[7] Defendants also argue that to the extent the SEC seeks civil disgorgement in an amount exceeding their net profits, such claims are subject to the five-year statute of limitations in Section 2462.  Dkt. No. 43 at 8.  However, as the SEC notes, "[t]his argument puts the cart before the horse."  Dkt. No. 44 at 12.  The question at this stage is whether the SEC has failed to state a cause of action for disgorgement, not the amount of disgorgement that the SEC is entitled to under the law.

and (ii) the NDAA does not apply retroactively to revive the SEC's scienter-based claims against him.  *Id.* at 10–14.  Defendants argue that, to hold otherwise, would violate the *ex post facto* clause of the United States Constitution.  *Id.*

In addressing this argument, the Court first addresses whether—absent the NDAA—the five-year statute of limitations in Section 2462 would bar the SEC's claims for disgorgement and injunctive relief and then, if so, whether the NDAA nonetheless revives those previously time-barred claims.

## A.       Section 2462

To start, it is clear that absent the NDAA, the SEC's claims for disgorgement against Stubos would be barred by the five-year statute of limitations under Section 2462.  As noted, the Supreme Court in *Kokesh* held that "[d]isgorgement, as it is applied in SEC enforcement proceedings, operates as a penalty under § 2462" and therefore "any claim for disgorgement in an SEC enforcement action must be commenced within five years of the date the claim accrued." 137 S. Ct. at 1645.  Plaintiffs' claims accrued no later than on or around April 2015, Dkt. No. 1 at 1 (defining the relevant period as "[f]rom at least March 2012 through at least April 2015"); *Gabelli*, 568 U.S. at 445–49 (claim under Section 2462 accrues when the fraud is complete), and the present action was filed on June 6, 2022, Dkt. No. 1.  Thus, absent the potential applicability of the NDAA, the SEC's action for disgorgement, which was filed over seven years after the latest date the SEC's claims accrued, would be time-barred under Section 2462.

Yet, while it is clear that prior to the NDAA, the SEC's enforcement action for disgorgement would be time barred under Section 2462, it is not so clear that this is true of the SEC's action for injunctive relief against Stubos.  Section 2462 does not expressly refer to actions for injunctive relief.  Instead, Section 2462 states that it applies to "an action, suit, or proceeding for the enforcement of *any civil fine, penalty, or forfeiture*, pecuniary or otherwise."

17

28 U.S.C. § 2462.  Defendants do not appear to contest that injunctive relief is not a "civil fine" or "forfeiture" under Section 2462, Dkt. No. 43 at 9 n.5; however, they do argue that injunctive relief is a "penalty" under Section 2462.  *Id.*

While "courts are divided on whether an injunction can ever be a § 2462 penalty," the weight of authority holds that SEC injunctions generally are not subject to Section 2462.  *S.E.C. v. Gentile*, 939 F.3d 549, 561 (3d Cir. 2019) (citing cases); *see S.E.C. v. Collyard*, 861 F.3d 760, 764 (8th Cir. 2017) (citing cases).  Both the Third and Eleventh Circuits have held categorically that properly issued SEC injunctions are not "penalties" under Section 2462.  *Gentile*, 939 F.3d at 562; *S.E.C. v. Graham*, 823 F.3d 1357, 1361 (11th Cir. 2016) (noting that a "penalty addresses a wrong done in the past," whereas an "[i]njunction, by contrast, typically look[s] forward in time").  In reaching this holding, the Third Circuit rejected the argument that "SEC injunctions are penalties, even when properly issued and framed," stating that this argument "runs headlong into a core tenet of equity jurisprudence," which is that "[t]he historic injunctive process was designed to deter [future violations], not to punish."  *Id.* at 556.  The court noted that, unlike a penalty, a preventative injunction serves solely a remedial purpose, which is to prevent future harm from occurring, and it is an "error to issue an injunction for punishment's sake."  *Id.*  Other courts, however, have declined to definitively decide whether an injunction may *ever* constitute a penalty under Section 2462, but have held that the SEC injunctions at issue did not constitute a penalty because they were aimed at protecting the public prospectively and did not have a punitive effect.  *See S.E.C. v. Collyard*, 831 F.3d 760, 764 (8th Cir. 2017); *S.E.C. v. Quinlan*, 373 F. App'x 581, 588 (6th Cir. 2010); *United States v. Telluride Co.*, 146 F.3d 1241, 1245–46 (10th Cir. 1998).  For example, the Eighth Circuit found that the injunction at issue—which enjoined the defendant from violating Exchange Act § 15(a)—did not constitute a penalty under

Section 2462 because it was "imposed to protect the public prospectively, not redress public wrong" and was "not imposed 'for the purpose of punishment' or to 'deter others from offending in like manner.'"  *Collyard*, 831 F.3d at 764 (citation omitted).[8]

The Court agrees that injunctive relief, if properly granted and fashioned, does not constitute a penalty.  Penalties are sought "for the purpose of punishment, and to deter others from offending in like manner." *Kokesh*, 137 S. Ct. at 1642 (citation omitted).  A penalty is essentially backward looking—it seeks to punish a defendant for their past wrongs and, by doing so, deter others from such conduct in the future.  This backward-looking feature of a penalty distinguishes it from injunctive relief—the objective of which is "solely to prevent threatened future harm." *Arthur Lipper Corp. v. S.E.C.*, 547 F.2d 171, 180 n.6 (2d Cir. 1976); *see Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 61 (1975) ("The historic injunctive process was designed to deter, not to punish."); *S.E.C. v. Moran*, 922 F. Supp. 867, 889 (S.D.N.Y. 1996) (Newman, J.) (same); 13 Moore's Federal Practice - Civil § 65.02 (2022) ("The purpose of injunctive relief is to prevent future harm.").  Evidence of a past violation, while often necessary, is not sufficient for an injunction; instead, the SEC must show "some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive" for an injunction. *S.E.C. v. Am. Bd. of Trade, Inc.*, 751 F.2d 529, 537 (2d Cir. 1984) (Friendly, J.).  The SEC must "go beyond the mere facts of past violations and demonstrate a realistic likelihood of recurrence." *S.E.C. v. Commonwealth Chem Sec., Inc.*, 574 F.2d 90, 99–100 (2d Cir. 1978)

---

[8] The Fifth Circuit, however, has found that a permanent injunction may constitute a penalty where the injunction does not "address the prevention of future harm in light of the minimal likelihood of similar conduct in the future" and is punitive in nature. *S.E.C. v. Bartek*, 484 F. App'x 949, 957 (5th Cir. 2012) (finding that an injunction barring "[d]efendants from violating any securities laws and bar[ing] the [d]efendants from serving as officers or directors at any public company" was punitive on this basis).

(Friendly, J.).  The key purpose of injunctive relief is thus remedial—*i.e.*, to prevent future wrongs—and not to "address wrong that have already been committed."  13 Moore's Federal Practice - Civil § 65.02 (2022).

While injunctive relief deters, the deterrent effect of injunctive relief is wholly different from that of a penalty.  Penalties serve "to deter *others* from offending in like manner."  *Kokesh*, 137 S. Ct. at 1642.  By contrast, injunctive relief serves to prevent, and thus to deter, the defendant *him or herself* from offending in a like manner in the future.  Injunctive remedies, as discussed, are tailored to deter future violations of law by that individual; not to punish the defendant and, through that punishment, send a message to those in the community not to do similar bad acts.  Moreover, to the extent that some deterrence of others does result from the imposition of an injunction against a particular defendant, such a result is "simply an incidental effect of" the injunctive relief.  *Id.* at 1643; *see Collyard*, 861 F.3d at 765 ("[D]eterrence is an 'incidental effect' of this injunction, not its primary purpose.").  It is not its primary purpose.  This distinguishes injunctive relief from disgorgement, which is primarily aimed at deterring violations of the securities laws.  *Kokesh*, 137 S. Ct. at 1643.

Because of its essentially remedial purposes, injunctive relief, properly granted and fashioned, is not a penalty.  The SEC's claims for injunctive relief are not subject to the five-year statute of limitations contained in Section 2462,[9] and, therefore, regardless of the applicability of the NCAA, are not time-barred.  This conclusion—that claims for injunctive relief prior to the enactment of the NCAA were not subject to a statute of limitations—is not incongruous with the ordinary functioning of a statute of limitations.  Injunctive relief may be granted only if, at the

---

[9] The Court does not address whether the injunctive relief here is properly fashioned and tied to the likelihood of future harms, as Defendants have not raised that argument at this stage.

time the injunction is requested, a threat of future illegal conduct exists.  That requirement

addresses many of the concerns that motivate statutes of limitations in the first place.  "Statutes

of limitations are intended to 'promote justice by preventing surprises through the revival of

claims that have been allowed to slumber until evidence has been lost, memories have faded, and

witnesses have disappeared.'"  *Gabelli*, 568 U.S. at 448 (citation omitted).  "The theory is that

even if one has a just claim it is unjust not to put the adversary on notice to defend within the

period of limitation."  *Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538, 554 (1974) (citation

omitted).  These concerns about lack of notice or surprise, however, are addressed implicitly in

the determination whether a threat of future unlawful conduct exists based on past violations.  If

the illegal conduct that gives rise to the request for injunctive relief is ancient and does not

support a claim of future risk of illegal conduct, the request will not be granted: the age of the

violative conduct and the defendant's behavior in the time period ensuing after that conduct took

place are relevant to the determination of whether a defendant is likely to reoffend.  *See Manor

Nursing Centers, Inc.*, 458 F.2d at 1100.  If the SEC sits on its claim, and if while the SEC has

been sitting on its claim the defendant has been an upstanding citizen (or at least has

demonstrated that he has reformed himself), injunctive relief may well not issue.

    The Court also declines to follow the single case on which Defendants rely in support of

their argument that injunctions are Section 2462 penalties.  In *S.E.C. v. Cohen*, 332 F. Supp. 3d

575 (E.D.N.Y. 2018), the court determined that an SEC obey-the-law injunction was a penalty

because the injunction would mark the defendants as "lawbreakers" and would not recompense

past victims.  *Id.* at 594–95.  The court held that "[b]ecause the SEC's requested obey-the-law

injunction cannot be understood as 'solely' remedial, it is a penalty for purposes of § 2462."  *Id.*

at 595.  *Cohen* is unpersuasive for two reasons:  First, in reaching its conclusion that the

injunction was punitive, the court noted that it "would impose no duties on Defendants beyond their existing duty to obey the law" and thus its purpose was to mark the defendants as "lawbreakers." *Id.* at 594. But, the fact that the injunction imposed no duties on defendants beyond requiring them to obey the law does not necessarily mean that the injunction is intended to punish a defendant for past wrongs. Injunctions are a "powerful" remedy due in large measure to the court's power to compel future lawful behavior through the threat of civil and criminal contempt. 13 Moore's Federal Practice - Civil § 65.80 (2022). An injunction also makes it easier and quicker for a party to seek relief for future violations of existing law: even leaving aside the specific deterrent effect of the risk of criminal contempt, civil contempt proceedings are generally summary in character, there is generally no right to trial by jury for a civil contempt proceeding, and no new process is required to subject someone to contempt when that party is already subject to the jurisdiction of the court. Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2960 (3d ed. 2022 update). To the extent that an injunction might mark a defendant as a "lawbreaker," or "stigmatize [her] in the eyes of the public," *Cohen*, 332 F. Supp. 3d at 594 (citation omitted), that is neither the purpose nor the necessary effect of injunctive relief. In many instances, it will be the result not of the relief awarded but of the fact that the defendant is adjudged a lawbreaker. Second, while it is true that an injunction does not recompense past victims, *Kokesh* does not compel the conclusion that the absence of this attribute alone means that an injunction is a penalty. *Kokesh* stated that a "pecuniary sanction operates as a penalty only if it is sought 'for the purpose of punishment, and to deter others from offending in like manner'—as opposed to compensating a victim for his loss." 137 S. Ct. at 1642. This statement explicitly concerns when "pecuniary sanction[s]" are penalties. *Id.* Moreover, "compensating a victim for his loss" is provided as one example of a pecuniary sanction that is not a penalty—the

Supreme Court did not state that it is the *only* example.  *Id.*  *Cohen* therefore does not impact this Court's analysis that injunctive relief is not subject to the five-year statute of limitations contained in Section 2462.

**B.    NDAA**

Finding that Section 2462 may bar the SEC's claims for disgorgement, the Court next addresses whether the NDAA saves these otherwise time-barred claims.

With respect to the SEC's non-scienter-based claim under Section 17(a)(3), Defendants argue that the NDAA does not apply since the NDAA only applies to disgorgement actions involving conduct that violates a provision "for which scienter must be established."  Dkt. No. 43 at 10; *see* 15 U.S.C. § 78u(d)(8)(A).  In response, the SEC concedes that "the statute of limitations to seek independent disgorgement for Stubos' violation of Section 17(a)(3) is five years, and thus has expired."  Dkt. No. 44 at 15.  The SEC, however, notes that it is still able to seek a "declaration that Stubos violated Section 17(a)(3) and obtain injunctive relief premised on that violation."  *Id.*  Accordingly, the Court declines to dismiss the SEC's claim under Section 17(a)(3) for disgorgement on the SEC's assurance that no such claim for relief exists.

With respect to the SEC's scienter-based claims, Defendants argues that they are time-barred as the NDAA does not apply retroactively.  Dkt. No. 43 at 10.  Specifically, Defendants argue that the scienter-based claims expired in April 2020 under the five-year statute of limitations contained in Section 2462 and cannot be retroactively revived by the NDAA, which was not passed until January 2021.  The SEC responds that the NDAA contains an explicit retroactivity command, Dkt. No. 44 at 12–13, and disgorgement is not a criminal or penal sanction that would fall within the *ex post facto* clause, *id.* at 15.

Courts do not lightly interfere with settled expectations.  In light of the presumption against retroactive legislation, "[u]nless Congress clearly expresses its intent to the contrary," a

court must "presume that a law has no retroactive application to conduct predating it." *Domond v. I.N.S.*, 244 F.3d 81, 85 (2d Cir. 2001).  "Retroactivity analysis requires two steps."  *Id.*  In the first step, the court must "determine whether Congress has expressly prescribed the statute's proper reach."  *Landgraf v. USI Film Prod.*, 511 U.S. 244, 280 (1994).  If not, then the court turns to the second step and must "determine whether the new statute would have retroactive effect."  *Id.*

The parties' dispute concerns the first step of the analysis and whether the NDAA contains an explicit retroactivity grant.  As described, NDAA provides that its new ten-year limitations period "shall apply with respect to any action or proceeding that is pending on, or commenced on or after, the date [January 1, 2021] of enactment of this Act."  NDAA § 6501(a)(3).

The retroactivity of the NDAA has been addressed by a number of courts, including in this District.  *See, e.g.*, *S.E.C. v. Hallam*, 42 F.4th 316, 335 (5th Cir. 2022) (noting that the NDAA makes clear that it is retroactive and applies to a case still on appeal); *S.E.C. v. Fowler*, 6 F.4th 255, 260 n.5 (2d Cir. 2021) ("A recent amendment to the Exchange Act took the SEC's claims for disgorgement and injunctive relief outside of the ambit of § 2462 and retroactively imposed a new, ten-year statute of limitations for those claims."); *S.E.C. v. Spartan Sec. Grp., Ltd.*, 2022 WL 3224008, at *8 (M.D. Fla. Aug. 10, 2022) ("The NDAA applies to any action or proceeding that is pending on January 1, 2021.  This action was pending on that date." (internal quotation marks and citation omitted)); *S.E.C. v. Gallison*, 2022 WL 604258, at *5 (S.D.N.Y. Mar. 1, 2022) ("Those changes are applicable to any action pending at the date of the NDAA's enactment."); *S.E.C. v. Ahmed*, 2021 WL 2471526, at *4 n.4 (D. Conn. June 16, 2021) ("[T]his case is 'pending' and the NDAA and its attendant modifications therefore apply."); *S.E.C. v.*

*Sidoti*, 2021 WL 1593253, at *6 (C.D. Cal. Mar. 19, 2021) (concluding that the NDAA "applies to all pending cases"). These cases all support or conclude that because the NDAA applies to actions "pending on" the date of its enactment, the ten-year statute of limitations applies retroactively with respect to those claims. *See, e.g.*, *Ahmed*, 2021 WL 2471526; *Sidoti*, 2021 WL 1593253.

But while the NDAA's retroactive application to cases pending at the time of its enactment is well-established, whether the NDAA applies retroactively to cases that were "commenced on or after" January 1, 2021, as is true of the SEC's claims here, apparently has been addressed in only one prior case. In *S.E.C. v. Sharp*, 2022 WL 4085676, at *11 (D. Mass. Sept. 6, 2022), Judge Young considered "whether the language 'ending on, or commenced on or after' creates the same explicit mandate of retroactivity for cases 'commenced . . . after' the statute's passage" and held that "it does." *Id.* at *11 (citation omitted). In reaching that decision, the court noted that this phrase "the words 'commenced . . . after' cannot be divorced from the context of their placement adjacent to the word 'pending,'" which expressly applies retroactively. *Id.* The court further noted that:

> If this Court read only "pending on" to apply retroactively, and not "commenced on or after," it would lead to an irrational outcome: (1) a case filed before or on December 31, 2020 seeking disgorgement for pre-January 1, 2016 conduct would receive the extended statute of limitations and be timely, and (2) a case filed January 2, 2021 seeking to reach the very same conduct would be untimely. SEC-enforcement actions would be able to reach more—or less—allegedly violative conduct, simply by virtue of their filing date under the exact same statutory scheme. Furthermore, reading the statute in this way would reward the SEC for filing what the Defendants argue are stale claims before the statute's enactment and penalize it for doing so once it arguably possessed such authority.

*Id.* The court also found that the "legislative history of the NDAA supports this conclusion." *Id.* at *12. The court stated that "there is an indication that Congress' intent was to reverse the

effects of the Supreme Court's decision in *Kokesh*" in passing the amendments in the NDAA and "[r]etroactivity adequately fulfills Congress' intent to undo the effects of *Kokesh*." *Id.*

The reasoning of the district court in *Sharp* is convincing.  The words "pending on" clearly envision—as other courts have held—that the statute of limitations contained in the NDAA has some retroactive effect and, in turn, revives some previously time-barred claims. These words "pending on" only have effect if the NDAA's expanded statute of limitations applies to resurrect these claims that were previously time-barred.  Otherwise, application of the NDAA to "pending" claims would be purposeless.  The only claims that would not have expired in cases that were "pending" on the effective date (and thus that would have been filed before the effective date) would already have been timely under the five-year statute of limitations previously in effect.  The Court would be required to presume that Congress added the word "pending" for no reason, contrary to the "so-called surplusage canon—the presumption that each word Congress uses is there for a reason."  *Advoc. Health Care Network v. Stapleton*, 137 S. Ct. 1652, 1659 (2017); *see Williams v. Taylor*, 529 U.S. 362, 364 (2000) ("[C]ourts must give effect, if possible, to every clause and word of a statute." (citation omitted)).  Thus, the NDAA has to have some retroactive effect and ability to restore stale claims at least as to cases that already were filed and thus were pending on the effective date.

It follows as a matter of basic statutory interpretation, however, that if the application of the NDAA to cases "pending" on the date of the enactment of the Act is to revive otherwise stale claims, its application to cases "commenced on or after" the date of enactment must also be to revive otherwise stale claims.  The operative language that the new statute of limitations "appl[ies]" refers indistinguishably both to actions or proceedings that are "pending" on the date of enactment and to those that are "commenced on or after" the date of enactment.  If the effect

of the application of the NDAA to pending cases is to revive otherwise stale claims, its effect as

to its application to cases commenced after the date of enactment must be the same.  To hold

otherwise would require this court to find that the single word "app[ies]" has two entirely

different meanings (one retroactive and the other not) simultaneously.  *See Erlenbaugh v. United

States*, 409 U.S. 239, 243 (1972) ("[A] legislative body generally uses a particular word with a

consistent meaning in a given context."); *cf. Gustafson v. Alloyd Co.*, 513 U.S. 561, 573 (1995)

("[W]e cannot accept the conclusion that this single operative word means one thing in one

section of the Act and something quite different in another."), and would produce internal

inconsistencies in the statute, *see United States v. Turkette*, 452 U.S. 576, 580 (1981) ("[I]nternal

inconsistencies in the statute must be dealt with.").  Furthermore, to hold that this retroactivity

only extends to pending claims, and not to claims "commenced on or after" the enactment of the

NDAA, would produce absurd results, NDAA § 6501(a)(3), as Judge Young details.  A

defendant who defrauded innocent investors could keep his ill-gotten gains from conduct

occurring on January 1, 2016, if the SEC did not file suit until January 3, 2021, while another

defendant whose fraudulent conduct dated back almost five years earlier would be subject to

disgorgement as long as the SEC brought suit two days earlier.  *See Gibbons v. Bristol-Myers

Squibb Co.*, 919 F.3d 699, 705 (2d Cir. 2019) ("[A] statute should be interpreted in a way that

avoids absurd results." (cleaned up)).  The defendant who assumed—based on the law existing at

the time he was sued—that the SEC could not seek disgorgement would be deprived of that

reasonable expectation and the SEC would be rewarded for filing a claim for relief that at the

time was plainly meritless.  At the same time, the SEC attorney who prudently waited to see if

the Congress acted on the *Kokesh* decision would be punished for the care she exercised.  Such a

27

construction would "yield absurd results." *See United States v. Scott*, 990 F.3d 94, 122 (2d Cir.), *cert. denied*, 142 S. Ct. 397 (2021).

The same result follows from application of the canon that courts "assume that Congress is aware of existing law when it passes legislation," *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990), and of "the judicial background against which it [was] legislat[ing]," *Dekalb Cnty. Pension Fund v. Transocean Ltd.*, 817 F.3d 393, 409 (2d Cir. 2016) (citation omitted).  That judicial background includes the Supreme Court's 1994 decision in *Landgraf*, 511 U.S. 244.  There, the Court held that provisions of the Civil Rights Act of 1991 expanding the monetary relief available under Title VII were not retroactive because the statutory language that the Act "shall take effect upon enactment" did not "even arguably suggest that it ha[d] any application to conduct that occurred at an earlier date." *Id.* at 257.  In so holding, the Court identified the kind of language that would serve as an "explicit retroactivity command." *Id.* at 256.  The Court noted that the Congress that enacted the 1991 Act at issue in *Landgraf* specifically eschewed language contained in a bill that had passed both Houses of Congress (but was vetoed by the President) the prior year; that bill would have provided that the new damages provisions "shall apply to all proceedings pending on or commenced after the date of enactment of this Act." *Id.* at 260 (quoting S. 2104, 101st Cong, 1st Sess. § 15(a)(4) (1990)).  The Supreme Court stated that had Congress wished for the provision in the 1991 Act "to have such a determinate meaning" of retroactivity, "it surely would have used language comparable to its reference to the predecessor Title VII damages provisions in the 1990 legislation." *Id.* at 259–60.  The Supreme Court reiterated that conclusion that such language would denote retroactivity five years later in *Martin v. Hadix*, 527 U.S. 343 (1999).  In *Martin*, the Court held that provisions of the Prison Litigation Reform Act of 1995 that placed limits on the fees that may be awarded to attorneys who litigate

prisoner lawsuits did not have retroactive effect.  In reaching this decision, the Court noted that

the statute did not include language stating that it would "apply to all proceedings pending on or

commenced after the date of enactment" that "might qualify as a clear statement that a statute

was to apply retroactively" and that made "explicit reference to the statute's temporal reach."  *Id.*

at 354–55 (citation omitted).

The NDAA was passed after *Landgraf* and *Martin* and against the backdrop of their

approach to retroactivity.  Those decisions detailed what Congress would need to say if it wished

to convey a "determinate meaning" of retroactivity.  *Landgraf*, 511 U.S. at 259.  And, Congress,

in passing the NDAA, chose to adopt the language that the Supreme Court stated in *Landgraf*

would convey a "determinate meaning" of retroactivity virtually verbatim.  Thus, fidelity to

legislative intent as well as to the notion that Congress means what it says when it adopts

language that has been defined to have an explicit statutory interpretation require that this Court

interpret the NDAA to apply retroactively and to revive previously time-barred claims both in

pending cases and in subsequently filed cases.

This interpretation is further supported by the legislative history of the NDAA.  *See*

*Unicolors, Inc. v. H&M Hennes & Mauritz, L. P.*, 142 S. Ct. 941, 948 (2022) ("[T]hose who

consider legislative history will find that history persuasive here."); *Enter. Mortg. Acceptance*

*Co., LLC, Sec. Litig. v. Enter. Mortg. Acceptance Co.*, 391 F.3d 401, 408 (2d Cir. 2004), *as*

*amended* (Jan. 7, 2005) (looking to legislative intent to determine retroactivity of the statute).  In

asking Congress to pass legislation expanding the statute of limitations for disgorgement actions,

the SEC repeatedly expressed concern not only with the effects of *Kokesh* on a going-forward

basis but with its untenable result on a backward-looking basis.  The SEC noted that fraudsters

who had obtained hundreds of millions of dollars of ill-gotten gains at the expense of members

of the public would be able to retain those funds instead of having them returned to the victims

through disgorgement.[10]  For example, shortly before the passage of the NDAA amendments, in

late 2020, the Chairman of the SEC spoke to the U.S. Senate Committee on Banking, Housing,

and Urban Affairs about the amount of disgorgement that the SEC has been unable to recover on

behalf of victims because of the statute of limitations imposed by *Kokesh*.  He stated: "Since

*Kokesh* was decided, more than $1 billion in ill-gotten gains has been unavailable for possible

distribution to harmed investors."  *Testimony on "Oversight of the Securities and Exchange*

*Commission,"* S.E.C. (Nov. 17, 2020), https://www.sec.gov/news/testimony/clayton-sec-

oversight-2020-11-17.  The Chairman continued by expressing his appreciation for "the

bipartisan, bicameral work underway to safeguard the Commission's disgorgement remedy and

ensure the Commission is able to seek recoveries in cases of well-concealed, long-running

frauds."  *Id.*  Members of Congress, in discussing an earlier bill to expand the statute of

limitations for disgorgement actions with similar retroactivity language, expressed their

---

[10] As an example, the then-Co-Directors of the SEC Division of Enforcement testified before a
subcommittee of the U.S. House of Representatives Committee on Financial Services on May
16, 2018.  During that testimony, they stated:

> In certain cases, *Kokesh* threatens to severely limit the recovery available to harmed
> investors.  Wrongdoers should not benefit because they succeeded in concealing
> their misconduct.  While we appreciate the need for clear statutes of limitations, we
> are concerned with an outcome where some investors must shoulder additional
> losses—and the fraudulent actor is able to keep those ill-gotten gains—because
> those investors were tricked early in a scheme rather than later.

Oversight of the SEC's Division of Enforcement: Hearing Before the H. Fin. Servs.
Comm. (May 16, 2018), https://www.sec.gov/news/testimony/testimony-oversight-secs-division-
enforcement; *see also* Testimony on "Oversight of the U.S. Securities and Exchange
Commission" Before the S. Comm. On Banking, Housing, and Urban Affairs (Dec. 11, 2018),
https://www.sec.gov/news/testimony/testimony-oversight-us-securities-and-exchange-
commission-0 (testifying about *Kokesh* and stating "[s]aid simply, if the fraud is well-concealed
and stretches beyond the five-year limitations period applicable to penalties, it is likely that we
will not have the ability to recover funds invested by our retail investors more than five years
ago").

understanding and agreement of these long-running concerns: Representative Ben McAdams, a-cosponsor of that bill, stated that the bill "would reverse the *Kokesh* decision" and was directly responsive to then-Chairman Clayton's concern that the *Kokesh* decision had prevented the SEC from pursuing over a billion dollars in disgorged funds.  165 Cong. Rec. H8930–31 (daily ed. Nov. 18, 2019); *Regents of Univ. of California v. Pub. Emp. Rels. Bd.*, 485 U.S. 589, 596 (1988) (looking to statements of sponsor of amendment to determine congressional intent).  He further noted that the decision allowed Kokesh to keep millions of dollars "that won't find its way back to the investor victims."  165 Cong. Rec. H8930.  The other co-sponsor of that earlier bill, Representative Bill Huizenga, pointed out that the effect of *Kokesh* was to allow Kokesh "the fraudster . . . to keep nearly \$30 million of what he stole from small-dollar Main Street investors," noting "I don't think any of us can look at that and feel good about that current situation."  165 Cong. Rec. H8931.  This history supports that Congress's intent in expanding the statute of limitations for disgorgement actions was to give the SEC the power to remove ill-gotten gains from their wrongful holder and to return those funds to the harmed investors.  It would disserve that intent to hold that the SEC can prove that Stubos obtained, and still enjoys the benefits of, millions of dollars of funds from innocent retail investors who believed that the price they were paying for the Petrosonic stock and Ener-Core stock was the true price and that they were buying the stock on the market (and not from an affiliate of those companies) but that the SEC still can do nothing about it.

Defendants' arguments to the contrary rely primarily on the Second Circuit's decision in *Enterprise Mortgage Acceptance Co.*, 391 F.3d 401.  In that case, the Second Circuit considered whether provisions of the newly enacted Sarbanes-Oxley Act of 2002 ("SOX"), which extended the statute of limitations for private civil actions for fraud under the federal securities laws had

retroactive effect to revive previously expired claims.  *Id.* at 403.  Section 804(b) of the statute

provided that the revised statute of limitations "shall apply to all proceedings addressed by this

section that are commenced on or after the . . . date of enactment of this Act."  *Id.* at 406 (citation

omitted).  Another provision of the statute, Section 804(c), stated: "Nothing in this section shall

create a new, private right of action."  *Id.* (citation omitted).  The court concluded that the new

statute of limitations did not revive stale private claims "[b]ecause the language of Section 804

does not unambiguously revive previously stale securities fraud claims, and because Section

804's legislative history does not suggest that Congress intended to provide for retroactive

application of the revised statute of limitations."  *Id.* at 406.  The court recognized that Section

804(b) was "perhaps most naturally read as applying to any proceeding" commenced after the

passage of the Act, but stated that did not lead to the conclusion that a claim that had expired

would be revived.  *Id.* at 406–07.  In other words, the language could be given meaning by

holding that it applied to cases commenced after the Act's passage, but not with the effect that

already-expired claims would be restored.  The Second Circuit also held that there was a "lack of

clarity that result[ed] from the tension that may be implied between [Sections] 804(b) and

804(c)," the latter of which provided that nothing in the section would "create a new, private

right of action."  *Id.* at 407.  The court noted that Section 804(c) "undermine[d] plaintiffs'

contention that, in enacting Section 804, Congress made its intentions for retroactivity

unmistakably clear" because "[w]here a plaintiff is empowered by a new statute to bring a cause

of action that previously had no basis in law, a new cause of action has, in some sense of the

word, been created."  *Id.*  Finally, the court stated that "[i]t also bears noting that the legislative

history of Section 804 does not clearly indicate that Congress intended that Section 804 apply

retroactively to revive expired securities fraud claims."  *Id.* at 408.

The NDAA has none of the features that the court in *Enterprise Mortgage* relied on to conclude that the retroactive effect of SOX was ambiguous.  In passing the NDAA, Congress did not just provide that the extended statute of limitations would apply to proceedings "commenced on or after" the date of its enactment.  It stated that the limitations period would apply to proceedings "pending on, or commenced on or after" the date of its enactment.  NDAA § 6501(a)(3).  The law also does not contain the language that the court concluded in *Enterprise Mortgage* created ambiguity, specifically that the limitations period was not intended to create a new cause of action.  The effect of holding that the NDAA is retroactive would also, unlike in *Enterprise Mortgage*, not be to create a new cause of action; it merely empowers the SEC to obtain relief on behalf of harmed investors in connection with a cause of action that is otherwise timely.  Moreover, as noted, in passing the NDAA, the legislative history supports that Congress possessed an intent to allow the SEC additional time to pursue on behalf of those harmed investors the more than $1 billion that was being held by the persons who harmed them.

Indeed, in deciding *Enterprise Mortgage*, the Second Circuit itself referred to the "pending on, or commenced on or after" language that Congress used in the NDAA as an "unambiguous" grant of retroactivity.  *Enter. Mortg. Acceptance Co.*, 391 F.3d at 407.  The court noted that the language "all proceedings *pending on* or commenced after the date of enactment" amounted to "an explicit retroactivity command," according to the Supreme Court, and that because SOX "contain[ed] none of th[at] unambiguous language," it could not conclude that the statute was unambiguously retroactive.  *Id.* at 406–07 (citing *Landgraf*, 511 U.S. at 255–56 & n. 8 and *Martin*, 527 U.S. at 354).  *Enterprise Mortgage* was decided before the NDAA was passed, and Congress would have had access to it when it passed the extended limitations period for the SEC to obtain disgorgement.  It follows from *Enterprise Mortgage* that the NDAA—

which uses the language that both *Landgraf* and the Second Circuit have stated conveys an explicit retroactivity command—should be given retroactive effect.

The Court also rejects Defendants' argument that the retroactive application of the NDAA here would violate the *ex post facto* clause of the United States Constitution.  "The *ex post facto* clause forbids retroactive application of penal legislation, not civil legislation." *Domond v. I.N.S.*, 244 F.3d 81, 87 (2d Cir. 2001).  In determining whether legislation is "penal" or "civil," courts "ordinarily defer to the legislature's stated intent" and "'only the clearest proof' will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty."  *Smith v. Doe*, 538 U.S. 84, 92 (2003) (citation omitted).  Here, the statutory scheme evinces a clear intent that disgorgement is a civil penalty, not a criminal penalty.  *See* 15 U.S.C. § 78u(d); *S.E.C. v. Kellen*, 2021 WL 4907238, at *4 (C.D. Cal. Sept. 14, 2021).  The statute charges the SEC, responsible for civil enforcement and administrative actions, with pursuing actions for disgorgement and the disgorgement remedy is listed alongside "civil money penalties."  15 U.S.C. § 78u(d); *see Doe*, 538 U.S. at 94 ("Other formal attributes of a legislative enactment, such as the manner of its codification or the enforcement procedures it establishes, are probative of the legislature's intent.").  The disgorgement remedy has also long been viewed as a civil not a criminal remedy.  *See S.E.C. v. Palmisano*, 135 F.3d 860, 865–66 (2d Cir. 1998) ("The disgorgement remedy . . . has not been considered a criminal sanction."); *see Gallison*, 2022 WL 604258, at *6.  Defendants nonetheless argue that the *ex post facto* clause applies because the *Kokesh* Court held that disgorgement was a "penalty."  *Kokesh* is inapt. Although *Kokesh* held that disgorgement constituted a penalty under Section 2462; it did not address whether it was criminal or civil.  137 S. Ct. at 1639.  The *ex post facto* clause therefore

does not bar retroactive application of the NDAA in this case.  *See Gallison*, 2022 WL 604258, at \*6 (holding the same); *Kellen*, 2021 WL 4907238, at \*4 (same).

For these reasons, the Court agrees with the holding in *Sharp* and holds that the NDAA applies retroactively to revive time-barred claims that were commenced on or after the NDAA was enacted and within ten-years after they accrued.  Because the parties do not dispute that the SEC brought its claims for disgorgement against Stubos within ten-years of accrual, these claims are timely.

III.    **The SEC Adequately Pleads Violations of Section 10(b) and Section 17(a)**

Defendants also argues that the Complaint warrants dismissal for failure to state a claim under Federal Rules of Civil Procedure 12(b)(6) and 9(b).  Dkt. No. 43 at 21–24.

First, Defendants argue that the SEC's stock promotion claims under Sections 10(b) and 17(a) fail as a matter of law because the SEC fails to allege that Stubos either made or disseminated the misleading stock promotions.  Dkt. No. 43 at 21–22.  This claim is unavailing for several reasons.  While it is true that "binding Supreme Court precedent" holds that "to plead a primary violation of Rule 10b-5(b) for a misstatement or omission a speaker must have actually 'made' a misleading statement," Dkt. No. 43 at 20 (citing *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 140 (2011)), the SEC did not charge Stubos with violating Rule 10b-5(b).  Stubos was instead charged with violating Sections 17(a)(1), (3) and Rule 10b-5(a), (c), which do not require that Stubos make a material misstatement or omission, *see* 15 U.S.C. § 77q(a)(1), (3); 17 CFR § 240.10b-5(1), (3); *S.E.C. v. Rio Tinto plc*, 41 F.4th 47, 49 (2d Cir. 2022).  Stubos cites no case to the contrary.

Furthermore, while the Second Circuit has held that "scheme liability" claims require "something beyond misstatements and omissions, *such as dissemination*," the Second Circuit did not hold that "dissemination" of a false statement is the only way to prove such claims.  *Rio*

*Tinto plc*, 41 F.4th at 49 (emphasis added).  To the contrary, the Second Circuit noted that "dissemination is *one example* of something extra that makes a violation a scheme."  *Id.* at 54 (emphasis added).  The Supreme Court has further stated "that the capacious words and 'expansive language' of 'device,' 'scheme' and 'artifice'" in Rule 10b-5 and Section 17(a)(1) "capture a wide range of conduct."  *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 2022 WL 4085677, at *55 (S.D.N.Y. Sept. 2, 2022) (quoting *Lorenzo v. S.E.C.*, 139 S. Ct. 1094, 1101–02 (2019)). Here, the Complaint alleges several "something extra[s]" beyond the misleading stock promotion allegations.  *Id.*  In particular, the Complaint alleges that Stubos used the Sharp Group and various nominee companies to conceal his majority ownership of Petrosonic and Ener-Core shares, broke those his ownership into blocks of less than 5% to avoid market scrutiny and to allow him to continue to hold unrestricted shares, failed to register his sales of these shares with the SEC as required under the securities laws, and directed Sharp Group traders via encrypted messages to strategically buy stock to inflate its price, and then secretly sold his stock without making the disclosures required by federal law and while pumping up the price of the stock through misleading disclosures made by stock promoters paid with money from him that was funneled through intermediary nominees.  Dkt. No. 1 ¶¶ 2, 16, 28–31, 37–40.  The misleading stock promotions are thus only one part of the many alleged deceptive actions that the SEC alleges Stubos took and which allowed him to sell shares of Petrosonic and Ener-Core shares to unsuspecting investors.  *See In re Turquoise Hill Res. Ltd. Sec. Litig.*, 2022 WL 4085677, at *58 ("[C]ourts have found that plaintiff successfully stated a claim for scheme liability because the defendants performed an inherently deceptive act that was distinct from an alleged misstatement.").

Second, Defendants argue that the stock promotion claims require dismissal for the separate reason that they fall short of the strict pleading standard of Federal Rule of Civil Procedure 9(b) as they fail to allege that any of the specific statements were untrue.  Dkt. No. 43 at 22.[11]  This claim is unavailing for similar reasons.  It is true that a plaintiff alleging fraudulent misstatements under Rule 10b-5(b) or Section 17(a)(2) must specifically allege "why the statements were fraudulent," *Wey*, 246 F. Supp. 3d at 911, but the SEC does not assert such a claim here.  As noted, the SEC's claim is premised on deceptive "conduct," not a particular deceptive statement, Dkt. No. 1 at ¶¶ 54–59, and a plaintiff pleading fraud based on deceptive conduct need only "specify what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors in the securities at issue," *Wey*, 246 F. Supp. 3d at 924 (quoting *In re Refco, Inc. Sec. Litig.*, 609 F.Supp.2d 304, 310 (S.D.N.Y. 2009), *aff'd sub nom. Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP*, 603 F.3d 144 (2d Cir. 2010)).  Defendants identify no deficiency in the SEC's pleadings with respect to any of these facts.

Finally, Defendants contend that the SEC fails to plead market manipulation under Section 9(a)(2) as while the Complaint concludes that Stubos's promotional activities and trading allowed him to indirectly increase investor demand and increase or maintain the price of Ener-Close and Petrosonic stock, the SEC does not plead facts to support this causal connection.  Dkt. No. 43 at 24.  "Section 9(a)(2) makes it unlawful for one or more persons to 'effect . . . a series of transaction in any security . . . creating actual or apparent active trading in such security, *or*

---

[11]  The SEC also need not plead such allegations under the standards set forth in the Private Securities Litigation Reform Act.  *See S.E.C. v. MiMedx Grp., Inc.*, 2022 WL 902784, at *5 (S.D.N.Y. Mar. 28, 2022) ("[T]he stricter standards of the Private Securities Litigation Reform Act ('PSLRA') do not govern SEC enforcement actions." (citing *S.E.C. v. Dunn*, 587 F. Supp. 2d 486, 601 (S.D.N.Y. 2008))).

raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.'" *S.E.C. v. Fiore*, 416 F. Supp. 3d 306, 325 (S.D.N.Y. 2019) (quoting 15 U.S.C. § 78i(a)(2)) (emphasis added); *see S.E.C. v. Schiffer*, 1998 WL 307375, at *6 (S.D.N.Y. June 11, 1998) ("[U]nder Section 9(a) of the Exchange Act, when a series of transactions that have raised or depressed a stock price (or have created actual or apparent sales volume) is carried out for the purpose of inducing others to buy or sell that stock, a market manipulation has occurred.").   In other words, a plaintiff may prove a Section 9(a)(2) violation through proof of a series of transactions creating actual or apparent active trading *as long as* these transactions were made "for the purpose of inducing the purchase or sale of such security by others."  15 U.S.C. § 78i(a)(2)); *S.E.C. v. Lek Sec. Corp.*, 276 F. Supp. 3d 49, 62 (S.D.N.Y. 2017) ("Proof of a violation of § 9(a)(2) requires evidence of 'manipulative motive and willfulness.").   In this case, the SEC has adequately pleaded such facts: the Complaint alleges that Stubos "directed Sharp Group via encrypted messages strategically to buy Petrosonic stock on numerous occasions in order to support and/or inflate its price," Dkt. No. 1 ¶ 36, and "engaged in manipulative trading to inflate the price of Ener-Core stock and to give a false appearance of active trading in the market," *id.* ¶ 41.   The Complaint details Stubos's manipulative trading activity, *id.* ¶ 42, including that Stubos was frequently on both sides of the trading of Ener-Core stock with no apparent purpose other than to manipulate the stock activity and through brokerage accounts in different countries so the transactions did not appear linked, *id.* ¶¶ 36, 41–45.   The Complaint further details how Stubos, through such manipulative trading, was able to influence the price of the stock of Ener-Core and Petrosonic: Stubos accounted for approximately 98% of the float of Petrosonic stock, *id.* ¶ 31, controlled approximately 99.7% of Ener-Core's unrestricted stock, *id.* ¶ 39, and the evidence shows that Ener-Core's price was

directly responsive to Stubos's manipulative trading.  *Id.* ¶¶ 42–44.  Finally, the Complaint includes allegations that support that Stubos possessed a manipulative intent.  For example, the Complaint alleges that Sharp wrote an encrypted message to the Sharp Group: "We want to show a little bit of activity here on this one.  Nothing big but 15-20k a day between 1.30 to 1.50 if you can manage so it looks natural . . .  Almost a coincidence."  *Id.* ¶ 41.  The Court therefore finds that the SEC's manipulative trading claim is adequately pleaded.

## IV.    Claim Against Relief-Defendant

Defendants also move to dismiss Count Four of the Complaint against Dori-Ann, arguing that "no such claim can survive in the absence of a viable claim against Mr. Stubos."  Dkt. No. 43 at 1 n.1.  For the reasons discussed, viable claims against Stubos do exist and thus the Court declines to dismiss this count against Dori-Ann on this basis.

## CONCLUSION

The motion to dismiss is DENIED.

The Clerk of Court is respectfully directed to close Dkt. No. 42.


SO ORDERED.

Dated: October 10, 2022
New York, New York                                          _____
                                                                               LEWIS J. LIMAN
                                                                      United States District Judge